**UNITED STATES LINES COMPANY,**
Libelant-Appellant,

v.

**UNITED STATES of America,**
Respondent-Appellee.

**No. 76, Docket 28286.**

United States Court of Appeals
Second Circuit.

Argued Oct. 21, 1963.

Decided Nov. 8, 1963.

Louis J. Gusmano, New York City (Kirlin, Campbell & Keating, New York City, on the brief), for libelant-appellant.

Richard S. Salzman, Department of Justice, Washington, D. C. (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, John W. Douglas, Asst. Atty. Gen., New York City, Alan S. Rosenthal, Department of Justice, Washington, D. C., on the brief), for respondent-appellee.

Before LUMBARD, Chief Judge, and MEDINA and FRIENDLY, Circuit Judges.

LUMBARD, Chief Judge.

Appellant, the United States Lines Company, prosecutes this appeal from a judgment of the United States District Court for the Southern District of New York which dismissed its libel brought against the United States to recover earned freight on westbound shipments from the United Kingdom of automobiles owned by military personnel.

Appellant contends that the shipments in dispute are governed by the terms of a contract, referred to as MST 1645, negotiated by the United States Lines with the Military Sea Transportation Service (MSTS) and effective April 1, 1953. The contract provided freight rates for a wide variety of categories of cargo and specifically a rate of $.66 per cubic foot for the category including the vehicles involved.

The government maintains that it was free to ship cargo covered by MST·1645 via United States Lines at the tariff rates applicable generally, which were approximately $.25 less per cubic foot of cargo than the MST rate.[1]

Prior to May 28, 1956, privately owned automobiles of military personnel could be shipped solely on government owned

---

1. The commercial tariff provided for a rate available to the general public for "motor cars, new and second hand, not packed, privately owned," which was 115 shillings (or $16.10) per weight/measurement ton until August 30, 1957, and 120 shillings (or $16.80) per weight/measurement ton from September 1, 1957 to May 31, 1960. A measurement ton is 40 cubic feet, and the rate translated into cubic feet was $.4025 per cubic foot until August 30, 1957, and $.42 per cubic foot from September 1, 1957 to May 31, 1960. See Tariff No. 18 of the North Atlantic Westbound Freight Association.

and operated vessels.[2]  On that date, 46 U.S.C. § 1241(c) was enacted to permit the government to employ the services of private carriers for such cargo.  Thereafter, MSTS commenced to ship vehicles of the type in question under the MST 1645 category "Unboxed vehicles and other unusual sized cargo."  Apparently through the negligence of the official primarily responsible, MSTS was unaware of the disparity between the MST 1645 and the commercial tariff rates.  Having been apprised of this disparity, Vice Admiral Gano, Commander of MSTS, on August 16, 1957, dispatched a cable to the MSTS command in London directing that all further shipments of vehicles owned by military personnel were to be booked by government bill of lading, employed in shipments made at normal commercial tariff rates, rather than by the shipping orders used in MST 1645 transactions.  United States Lines was informed of this determination.

All shipments of these vehicles subsequent to August 16, 1957, which shipments are here in dispute, were executed by government bills of lading rather than the shipping orders called for by MST 1645.  However, United States Lines endorsed the bills of lading and the public vouchers issued for transportation charges with the words "FREIGHT RATE IN DISPUTE," thereby preserving for future litigation its position that MST 1645 rates governed the transactions.  The total difference between the bill of lading rate and the MST contract rate during the period in dispute, August 16, 1957 to May 31, 1960, was $341,228.82.

Judge Palmieri, after a trial, dismissed the libel on the grounds that under the terms of MST 1645 the government was free to ship cargo covered by that agreement at regular commercial tariff rates rather than at the contract rates and, further, that the freight rates embodied in MST 1645 were higher than those established for transporting like goods for private shippers and therefore were violative of the McCumber amendment, 10 U.S.C. § 2631.  From this dismissal the United States Lines appeals.

We are not persuaded by the appellant's argument that the terms of MST 1645, upon which it must rely to sustain its claim, precluded the government from shipping cargo described in the contract via United States Lines at the more attractive commercial tariff rates.

MST 1645 nowhere requires the government to ship any cargo whatsoever.  While the parties could certainly have executed a contract which permitted the government to ship cargo with carriers other than the appellant but which limited the government to the MST 1645 rates for any cargo shipped via United States Lines, we do not find this agreement to have effected such a limitation.  Subsection (b) of Article 2 of the agreement provides that "The Contractor [United States Lines] agrees to transport any lawful cargo offered * * * provided the Contractor has space available on the date or between the dates for which cargo is offered."  Subsection (c) provides that "Shipping orders * * * may be issued by the Government from time to time to the Contractor and the Contractor shall provide for the transportation of the cargo * * * "  Subsection (d) provides that inbound cargo, such as that presently in dispute, "shall be booked by authorized representatives of the Government and shall be transported at the rate specified in Article 3.  Shipping Orders confirming bookings for inbound cargo shall be issued as soon as possible."

The appellant maintains that the terminology of subsection (d) makes clear that all inbound cargo was to be carried at the negotiated contract rate and that a shipping order was unnecessary to effect a binding obligation between the government and the carrier.  But if subsection (c) leaves the government free to ship outbound cargo at tariff rates, as we think it did, it would be unreasonable to suppose that the parties intended a different result as to inbound cargo.  The

2.  See 10 U.S.C. § 4748, repealed September 7, 1962, 76 Stat. 513.

purpose of the separate reference to inbound cargo was rather to permit authorized government personnel to make a binding commitment for shipments and submit a shipping order as soon thereafter as is practicable. Indeed, testimony before the district court indicated that the normal course for inbound shipments was for a government representative to book space on an outgoing vessel over the telephone. There is thus little justification for construing subsection (d) as limiting, for inbound cargo alone, the complete freedom of choice which subsection (c) apparently grants the government.

In view of the possible ambiguity in the contract language it was in order for the parties to introduce evidence relating to the negotiations preceding the agreement, the practice under the agreement, and the general issue of the intentions of the parties. Having heard the evidence of both parties on this issue, Judge Palmieri found that "it was within the fair intendment of the parties to the MST contract that the Government should remain free to make its shipments in the most advantageous manner * * *" This finding was not clearly erroneous. The government introduced evidence that MST 1645, like other similar agreements, was understood to create no binding obligation upon the government, and that this understanding was well known to the shipping companies.

■ We are not persuaded by the United States Lines' contention that even if MST 1645 constituted no more than an offer, the offer was indivisible, and since the government continued to ship at the contract rates for all cargo except second-hand automobiles the government was bound to the contract rate for the latter cargo as well. Under MST 1645 the government was free to ship any, all or none of its cargo at the contract rate, and this option could not be destroyed, as the appellant would have it, by the government's exercise of it to the extent of making some shipments at the contract rate.

■ Nor do we find any substance in the claim that because the government required in its bills of lading that the appellant grant it special services, allegedly available only under the contract, the rates embodied in the contract were applicable. The services in question were the loading and discharging of the cargo at military piers rather than at the carrier's piers and the waiver by the carrier of the one-year limitations period embodied in the Carriage of Goods by Sea Act, 46 U.S.C. § 1303(6). Were these services in fact special there might be merit in the appellant's claim. However, there was uncontradicted evidence that movement of the cargo at the shipper's piers was the type of service which any large shipper would generally be granted. And the waiver of the limitations period was apparently part of the printed form used by the government in its shipping transactions generally.

Accordingly we agree with Judge Palmieri that the government was not obligated to pay anything beyond the applicable commercial tariff rates for the vehicles of military personnel transported by United States Lines during the period in question.

Since MST 1645 did not apply to the shipments in question we do not reach the question whether the rates embodied in the agreement, in light of the services required by the government, were so excessive as to be violative of the provisions of the McCumber amendment, 10 U.S.C. § 2631.

We therefore affirm the judgment of the court below.