CRAFT MACHINE WORKS, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 634–88C.

United States Claims Court.

May 4, 1990.

Marcus B. Slater, Jr., Washington, D.C., for plaintiff; William C. Buckhold, of counsel.

Robert M. Hollis, Washington, D.C., with whom was G. Scott Williams and Asst. Atty. Gen. Stuart M. Gerson, for defendant; Helen D. Rosen, Office of Gen. Counsel, Dept. of the Navy, of counsel.

OPINION

NETTESHEIM, Judge.

This case is before the court after argument on cross-motions for summary judgment. The principal dispute between the parties is whether the term "supplies", as used in the Cargo Preference Act of 1904, 33 Stat. 518 (1904) (current version at 10 U.S.C. § 2631 (1988), and implementing regulation, 48 C.F.R. § 52.247–64 (1986), is limited to "end items" or covers end items and their component parts.

On March 7, 1990, this court issued an unpublished opinion granting defendant's motion for summary judgment based on the plain meaning of the contract. Since plaintiff's claim had been pleaded as a sev-

erable cause of action (Count I pleading a unilateral change to the contract), the grant of defendant's motion was not final and was subject to RUSCC 54(b). The opinion explained that the court was unable to resolve the parties' contentions, in the alternative, concerning patent and latent ambiguities in the contract because of disputes as to genuine issues of material fact. Most of the briefing and exhibits were devoted to the issue of ambiguity. However, since the cross-motions joined on the issue of the plain meaning of the contract, the decision was based on this ground. Although the plain meaning of the contract was dispositive, the court exercised its discretion to require the declarants to testify pursuant to RUSCC 43(c). The percipient witnesses' testimony concerning an alleged ambiguity spoke to events occurring over four years ago. The goal was to complete a timely record at the trial level resolving all disputed issues of fact relating to contract interpretation. Finally, the opinion explained that a ruling was issuing on one issue, plain meaning, in order to limit depositions.

Plaintiff moved for reconsideration, and defendant agreed with plaintiff's position, arguing that requiring the declarants to testify was too expensive, given the alternative to enter judgment for defendant on the issue of the contract's plain meaning. The court defers to the parties' wishes. The following opinion includes the court's earlier unpublished ruling and also identifies the factual disputes that prevented adjudication of the ambiguity issue.

## FACTS

The following facts are undisputed. Craft Machine Works, Inc. ("plaintiff"), a Virginia-based manufacturer of heavy machinery, entered into a two-step, multi-year supply contract with the Naval Facilities and Engineering Command of the Department of the Navy ("NAVFAC"). Under the two-step procedure, bidders whose technical proposal was found acceptable in the first step of the procurement, were invited to submit fixed-priced bids on the design, fabrication, delivery and installation of 23 portal cranes. The portal cranes were destined for use at various naval shipyards throughout the United States. Plaintiff was awarded contract N62472–82–C–1455 on or about February 21, 1986. This five-year firm fixed-price contract was for the sum of $73,709,013.00, with $19,971,248.00 obligated in the first program year.

Following the formation of its agreement with NAVFAC, plaintiff subcontracted with Clyde Crane Division ("Clyde"), a Division of AMCA International, now renamed AmClyde Engineered Products ("AmClyde").[1] Plaintiff contracted with AmClyde for the design, manufacture, and delivery to plaintiff's Hampton Roads, Virginia facility of the 23 portal cranes. Under the subcontract the cranes were to be delivered to the Hampton Roads facility in major subassemblies. The Craft–AmClyde agreement of May 29, 1986, included quotations totaling $57,499,350.00. AmClyde's subcontract incorporated by reference the "Preference for Privately-owned U.S.-Flag Commercial Vessels—Alternate I," as found at 48 C.F.R. § 52.247–64 (1986).

AmClyde, in turn, subcontracted with Hyundai Heavy Industries Ltd., a Hyundai Corporation ("Hyundai"), for fabrication of substantially all of the cranes' major structural components. Per an agreement dated October 31, 1986, Hyundai agreed to fabricate many of the individual crane parts at its facilities in the Republic of Korea.

Following the agreements between plaintiff and AmClyde and between AmClyde and Hyundai, AmClyde solicited quotations from a variety of shipping firms to transport completed components from Korea to plaintiff's facilities in the United States. One of the firms solicited was Mammoet Shipping, B.V. ("Mammoet"), a foreign-flag carrier. Mammoet submitted a quotation to AmClyde of $95.00 per cubic meter for shipment of cargo from Korea to Hampton Roads, Virginia.

---

1. In early 1987 Clyde changed its name to AmClyde Engineered Products, a Division of AMCA International Corporation.

The Cargo Preference Act of 1904, 33 Stat. 518 (1904) (current version at 10 U.S.C. § 2631 (1988)) (the "Act"), regulates the use of foreign-flag ocean carriers on military contracts. The Act provides, in pertinent part:

Only vessels of the United States or belonging to the United States may be used in the transportation by sea of supplies bought for the Army, Navy, Air Force, or Marine Corps....

The Federal Acquisition Regulation ("FAR") implementing the Act, 48 C.F.R. § 52.247–64, required the insertion of this clause into plaintiff's contract:

(a) Except as provided in paragraph (b) below, the contractor shall use privately owned U.S.-flag commercial vessels, and no others, in the ocean transportation of any supplies to be furnished under this contract.

(b) If such vessels are not available for timely shipment at rates that are fair and reasonable for privately owned U.S.-flag commercial vessels, the Contractor shall notify the Contracting Officer and request (1) authorization to ship in foreign-flag vessels or (2) designation of available U.S.-flag vessels. If the Contractor is authorized in writing by the Contracting Officer to ship the supplies in foreign-flag vessels, the contract price shall be equitably adjusted to reflect the difference in costs of shipping the supplies in privately owned U.S.-flag commercial vessels and in foreign-flag vessels.

. . . .

(d) Except for small purchases as described in 48 C.F.R. 13, the Contractor shall insert the substance of this clause, including this paragraph (d), in all subcontracts, or purchases under this contract.

Compliance with the requirements for use of U.S.-flag vessels is monitored by requiring the contractor to submit bills of lading which identify, among other items, the flag of registry for vessels making shipments which originate outside of the United States. FAR § 54.247–64(c)(2).

The term "supplies" is defined in a FAR section dedicated to "words and terms commonly used in this regulation" as:

all property except land or interest in land. It includes (but is not limited to) public works, buildings, and facilities; ships, floating equipment, and vessels of every character, type and description, together with parts and accessories; aircraft and aircraft parts, accessories and equipment; machine tools; and the alteration or installation of any of the foregoing.

FAR § 2.101.

By letters dated October 5, 1987, S. Thomas Romero of the Maritime Administration ("MARAD") of the United States Department of Transportation, wrote both plaintiff and AmClyde. In his letters Mr. Romero advised the contractors:

As you know, the FAR Clause *requires* the *exclusive use of U.S.-flag vessels* and the reporting of all ocean shipments to this office.

It is our understanding that the contractors have been contacted by several U.S.-flag carriers who have indicated their availability in transporting the parts from Korea, attendant to the manufacture of the cranes, in a timely and efficient manner. Therefore, the purpose in bringing this matter to your attention is to ensure that all parts, exported from Korea by [Hyundai], received by your company relative to the building of the cranes, must be carried aboard U.S.-flag vessels in order to ensure compliance with the above-cited FAR clause.

(Emphasis in original.) In a letter dated October 13, 1987, AmClyde Senior Project Manager R.H. Monahan wrote to the Contracting Officer at NAVFAC's Northern Division office in Philadelphia, Pennsylvania, and enclosed the October 5 correspondence from MARAD. Taking issue with MARAD's construction of the FAR § 52.247–64, Mr. Monahan wrote:

Mr. Romero takes the position that FAR Clause 52.274–64, Alternate 1, requires that components we are having manufactured in Korea as a subcontractor under the above contract be shipped on U.S.

flag vessels. We disagree. By its terms, the clause applies to "supplies." Supplies mean end items, not components. . . .

This is to advise you that we are completing negotiations for shipment of the Korean-manufactured components on foreign flag vessels. . . . If you disagree with our position as to the meaning of the clause, we require your advice prior to October 23, 1987. You should be aware, however, that if you disagree with our position and so advise us, we will treat that advice as a constructive change order under our contract.

Having received no response from NAVFAC officials regarding either the October 13 letter or the contracting officer's construction of the term "supplies", AmClyde entered into a contract for the transport of cranes with Mammoet. The agreement was executed on or about December 1, 1987. It is defendant's contention that NAVFAC had no obligation to give contractual direction to AmClyde, a subcontractor, with whom it had no privity of contract. It was the contracting officer's practice to refer such correspondence to the prime contractor.

A similar dispute as to the reach of the Act's requirements had been raging among the Department of Defense (the "DOD"), MARAD, and several members of Congress. DOD officials were concerned that under a broad reading of the Act "every shipment by every supplier or contractor at any tier of every nut, bolt or scrap of raw material that ultimately finds its way into equipment purchased by the Military Departments. . . ." would be required to be shipped aboard U.S.-flag vessels. ___ Op. Att'y.Gen. ___ (1988) (Memorandum of Assistant Attorney General at 6-7 (Feb. 2, 1988)) [hereinafter "Attorney General Opinion"]. On September 18, 1986, this view was offered by Frederick S. Sterns, Director of Installations and Facilities in the Office of the Assistant Secretary of the Navy for Shipbuilding and Logistics during testimony before the House Subcommittee on the Merchant Marine. Referencing a procurement whereby the J.D. Bertolini Company was to provide storage containers to the Navy, Mr. Sterns explained how the Navy interpreted the reach of the Act's requirements in that contract:

I must note, however, that the "supplies" to be furnished under [the Bertolini] contract will not be transported on the ocean. The containers to be furnished by Bertolini will be manufactured in and become the property of the United States in California and Mississippi. The manufacturing process will be with respect to many components shipped on the contractor's account from Canada, Portugal and Korea. Nevertheless, the "supplies" to be furnished under the contract will be transported from points within the United States. There is virtually no likelihood that such "supplies" will be shipped on any vessels after manufacture and prior to their inspection and acceptance by the Navy.

We realize there is some disagreement with our interpretation of this contract provision but we believe this long-standing view is the only legally supportable conclusion.

*Government Agency Compliance with Cargo Preference Laws: Hearings Before the Subcomm. on Merchant Marine of the House Comm. on the Merchant Marine and Fisheries*, 99th Cong.2d Sess. 10 (1986). Under the DOD's view, component parts were not supplies, and therefore their shipment aboard U.S.-flag carriers was not required. MARAD expressed a contrary view. It was MARAD's position that all items which are "destined by contract for use by the armed forces" are supplies and therefore are covered by the Act's requirements; this was so even if title to the items had not yet passed to the United States. Attorney General Opinion at 1.

Following the congressional hearings, the DOD and MARAD agreed to submit the dispute over the meaning of the Act to the Department of Justice for resolution. The Department of Justice's Office of Legal Policy made its views known through the Attorney General's Opinion dated February 2, 1988. The Attorney General's Opinion discussed the competing views of the different agencies, the meaning of the

statutory provisions according to conventions of statutory construction, and significant portions of the Act's legislative history. Throughout, the opinion focused on the question of whether the Act's requirements were operative as to items whose title was vested in the contractor at the time of shipment, yet destined for transfer to the United States:

> DOD's conclusory statement that Congress "did not intend to extend the scope of the (Cargo Preference) statute beyond government-owned supplies" is unsupported by legislative pronouncements, and ignores the fact that the statute speaks to supplies "bought for" ("purchased for") the Government—not 'Government-owned supplies'....

Attorney General Opinion n. 14 (citation omitted). The Department of Justice concluded that a broader reading of the statute than the one outlined by the DOD was necessary to effect congressional intent:

> A niggardly reading of section 2631 would thus not comport with Congress' overriding purpose of managing government procurement so as to maintain an ample merchant marine. Indeed, if DOD were required to use the merchant marine only when it had obtained actual title to the goods being shipped, the Act's purpose could be wholly eviscerated (at least insofar as the transportation of new supplies are concerned) by the simple expedient of delaying transfers of title to DOD until the time of delivery....[2]

*Id.* at 6–7. The Attorney General's Opinion thus seemed to support the position taken by Mr. Romero of MARAD in the letters written to AmClyde the previous October: All parts must be shipped on U.S.-flag carriers in order to comply with the Act's requirements.

By letter dated March 18, 1988, Delores O'Malley, Director of the Procurement Contracts Office of NAVFAC, Northern Division, forwarded plaintiff a copy of the Attorney General's Opinion. By memorandum dated April 4, 1985, Ms. O'Malley received a DOD policy statement instructing contracting officers that the Department of Justice's construction of the Act "is effective immediately on all existing and prospective contracts." The March 18 letter to plaintiff was followed by additional correspondence from Ms. O'Malley, dated April 5, 1988:

> On 18 March 1988 we forwarded you a copy of a Department of Justice ruling on the application of the ... Cargo Preference Act of 1904. Notwithstanding your subcontractor's stated position that this Act does not apply to its shipments, since it considers the items to be components and not supplies, the analysis and conclusion of the ruling clearly require that the items in question under the subject contract requiring ocean transport be shipped on U.S. flag vessels, if available at reasonable prices.
>
> We view this as a serious situation and request you immediately respond with your assurances that you and any of your subcontractors will comply with the requirements of the Act.

On or about May 1, 1989, AmClyde signaled Mammoet with a "Notice of Cargo Readiness" that its cargo would be ready for shipment. Under the AmClyde–Mammoet contract, the notice was to be filed with Mammoet 60 days in advance of the desired shipment date. If cancellation of the shipping contract were to occur after the notice was given, AmClyde would be liable for cancellation fees.

By letter of May 20, 1988, plaintiff's attorney, Donald L. Moore, wrote to the NAVFAC Northern Division. In his letter Mr. Moore requested unambiguous direction from the contracting officer to ship the component parts aboard U.S.-flag carriers:

---

2. Since the case at bar concerns whether major subassemblies manufactured by Hyundai should have been transported aboard U.S.-flag carriers, the court need not reach the question of whether its ruling comports with the view taken in the Attorney General's Opinion that the Act does not require shipment by U.S.-flag vessel of "every nut, bolt or scrap of raw material that ultimately finds its way into equipment purchased by the Military Departments...." Attorney General Opinion at 6–7. The Attorney General's Opinion concerns a broader range of contracts and policy questions than are presented upon these facts.

[W]e are not absolutely certain that we understand the exact nature of your direction or your intent, and we are not confident that you fully comprehend the consequences which could flow from potential interpretations of your letter. Therefore, we must confirm your direction, assure that there is no misunderstanding as to what you intended, and be certain that you are aware of the consequences of your decision.

The confirmation from NAVFAC was sent by a letter dated June 2, 1988. In that letter, Robert Boyer, Director, Contracts Policy Division, NAVFAC, advised plaintiff that "the Contracting Officer has determined that the cargo must be shipped by [a] privately owned U.S.–Flag commercial vessel...."

Responding to this letter, AmClyde canceled its shipping contract with Mammoet by letter dated June 3, 1988. On June 7, 1988, Mammoet informed AmClyde that it would hold AmClyde responsible for cancellation fees. Plaintiff filed a certified request for an equitable adjustment to the contract price on July 21, 1988, which was denied by the contracting officer on September 20, 1988. As of the time of its certified claim, no shipment of crane components had occurred, nor had plaintiff paid the cancellation fee demanded by Mammoet. Plaintiff claims that the failure of both the contracting officer, and the contract itself, to provide clear direction resulted in increased prices, cancellation costs, lost interest, and performance delays. Plaintiff seeks to recover $6,121,-772.00.

## DISCUSSION

### I. *Summary judgment standards*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. *Id.* Both plaintiff and defendant, as the moving parties, have the burden of establishing that there are no genuine material issues in dispute and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

In the capacity of opposing each other's motion, plaintiff and defendant have the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex*, 477 U.S. at 322, 324, 106 S.Ct. at 2553. In resolving the cross-motions, the court cannot weigh the evidence and determine the truth of the matter on summary judgment. *Anderson*, 477 U.S. at 249, 255, 106 S.Ct. at 2510, 2513. Any evidence presented by the opponent is to be believed and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513. Uncontested material facts also have been found consistent with the rule that, in respect of any facts that may be considered as contested, each party, in its capacity as the opponent of summary judgment, is entitled to "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

### II. *Plain meaning of the contract*

Defendant asserts that the Act's provisions in plaintiff's contract required that component parts of the portal cranes, manufactured by Hyundai in Korea, be shipped to the United States aboard U.S.-flag carriers. The court's primary function in interpreting plaintiff's contract is discern what the parties intended when forming their agreement. *SCM Corp. v. United States*, 230 Ct.Cl. 199, 203, 675 F.2d 280, 283 (1982) (citing *Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 72, 389 F.2d 424, 429 (1968)). To discover their intentions the court will read the contract as a whole, ascribing to the contract language

its ordinary and commonly accepted meaning, unless it is shown that the parties intended otherwise. *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 390, 351 F.2d 972, 976 (1965). Thus, in the absence of clear evidence indicating a contrary intention between the parties, the plain and unambiguous meaning of a written agreement will control. *See George Hyman Constr. Co. v. United States,* 832 F.2d 574, 579–81 (Fed.Cir.1987) (court would not "rewrite the contract" where the plain meaning of the terms were unambiguous).

■ The Cargo Preference clause included in plaintiff's contract requires U.S.-flag shipment of "any supplies to be furnished" under the contract. FAR § 52.247–64. Because the term "supplies" is unadorned, and because the context in which the term is used does not lend itself to a different construction,[3] the best definition of the term is that found in the general definition section of the regulations. Under the general definitions, FAR § 2.101, the term "supplies" is defined as:

all property except land or interest in land. It includes (but is not limited to) public works, buildings, and facilities; ships, floating equipment, and vessels of every character, type and description, together with parts and accessories; aircraft and aircraft parts, accessories and equipment; machine tools; and the alteration or installation of any of the foregoing.

"All property except land or interst in land" suggests a very broad category of items—including component parts and end items. Moreover, the general definition includes, but is not limited to, "vessels of every character, type and description together with their parts and accessories" and "aircraft and aircraft parts, accessories and equipment." It follows that if ships and their component parts are supplies and aircraft and their component parts are supplies, portal cranes and their component parts should likewise be regarded as supplies. The major sub-assemblies

manufactured by Hyundai should have been transported to Virginia aboard U.S.-flag carriers; therefore, the contracting officer acted appropriately when she directed plaintiff to transport the components aboard ships registered in the United States.

Although the language of plaintiff's contract is both broad and clear, the legislative mandate behind the Act supports the conclusion that the carriage aboard U.S.-flag ships was required. The Act, as enacted by Congress in 1904, reads in pertinent part:

That vessels of the United States, or belonging to the United States, and no others, shall be employed in the transportation by sea of coal, provisions, fodder, or *supplies of any description,* purchased pursuant to law, for the use of the Army or the Navy....

33 Stat. 518, 518–19 (1904) (emphasis added). Intending to "restate, without substantive change," 70A Stat. 640 (1956), Congress recodified the Act in 1956. The Act, as recodified, reads in pertinent part:

Only vessels of the United States or belonging to the United States may be used in the transportation by sea of *supplies bought for* the Army, Navy, Air Force, or Marine Corps....

(Emphasis added.) Use of the phrase "supplies of any description" in the original Act suggests that Congress did not intend the result urged by plaintiff. The Act's requirements are stated broadly and without qualification as to which types of items are covered. *Cf. United States Lines Co. v. United States,* 223 F.Supp. 838, 844 (S.D. N.Y.) ("The text of the original Act and the legislative history of the Act of 1904, show that Congress intended that the broadest interpretation be given to 'coal, provisions, fodder or supplies of any description....'"), *aff'd,* 324 F.2d 97 (2d Cir.1963). Plaintiff's contention that Congress intended carriage by a U.S.-flag vessel only under circumstances wherein an article could be described as an end item, but would not

---

**3.** The FAR provide that the general definitions are appropriate for use in all but two situations: when "(a) the context in which [the terms] are used clearly requires a different meaning or (b) a different definition is prescribed for a particular part or portion of a part." FAR § 2.101.

require such a result if the same article were a component, is not supported by the text of the statute. In each case, whether described as a component or an end item, carriage by a U.S.-flag vessel is required.

There is a parallel between the case at bar and *Navajo Tribe of Indians v. United States*, 176 Ct.Cl. 502, 364 F.2d 320 (1966). In *Navajo Tribe* plaintiff sought additional compensation for oil and gas rights appertaining to Rattlesnake field, an area within the Navajo Indian Reservation. Under an assignment from the tribe's lessee, the Government acquired rights to a reserve of helium-bearing gas, for which the tribe claimed additional monies. The question before the Court of Claims was whether a 1923 lease of "all oil and gas deposits" conveyed rights to helium-bearing gas. If so, the Government would be entitled to the helium-bearing gas reserves under its assignment. Holding that the tribe did not limit the original lease to "hydrocarbon" gases, reserving to itself "non-hydrocarbon" gases, the court reasoned:

> Although the parties may have been thinking mainly of fuel-type gases, it is still more realistic to presume that the grant included not only hydrocarbons but other gaseous elements as well. It fol-

lows that, whether [the helium] percentage was high or low, the helium component was part of the "gas deposit" which passed to the lessee.

176 Ct.Cl. at 513, 364 F.2d at 326. Similarly, while parties to government contracts may often think of supplies as end items,[4] given the plain language of the statute, regulations, and contract, it is more realistic to assume that components, as well as end items, are required to be shipped aboard U.S.-flag carriers.

In further support of its argument that the term "supplies" should be read expansively to include both components and end items, defendant references the use of the term "supplies" in five other clauses of plaintiff's contract: the Duty Free Entry clause, the Buy American Act clause, the Maintenance and Warranty Service of Equipment clause, the Inspection of Supplies clause, and the Warranty of Complex Products clause. Plaintiff's response throughout is that "supplies" generally means end items, yet with each of the cited clauses a different construction of the term "supplies" is required by the text. *See* FAR § 2.101. (The general definition of "supplies" is applicable unless the context in which the term is used clearly requires a

---

**4.** The declaration of Professor John Cibinic, Jr., supported plaintiff's argument that the government contracting community interprets the term "supplies" to signify end items. Acknowledging that the declarant is a renowned author and lecturer on government contract matters, the court determines that the term "supplies" is not one which the contract itself fails to make clear.

This case differs from cases typically calling for insight into trade practices, such as *W.G. Cornell Co. v. United States*, 179 Ct.Cl. 651, 376 F.2d 299 (1967); *Gholson, Byars & Holmes Construction Co. v. United States*, 173 Ct.Cl. 374, 351 F.2d 987 (1965); and *Haehn Management Co. v. United States*, 15 Cl.Ct. 50 (1988), *aff'd*, 878 F.2d 1445 (Fed.Cir.1989) (Table). In *W.G. Cornell* the question was whether flexible insulation submitted by the contractor was "equally suitable" to rigid board type insulation demanded by the contracting officer. Reference to trade practice was required so as to enable the court to determine whether flexible insulation was "equally suitable"; reading of the contract documents and regulations was not enough. 179 Ct.Cl. at 663–73, 376 F.2d at 307–13. Similarly, in *Gholson* an issue was whether a metal surface with a finish of baked enamel could be

considered a "previously painted surface." The court observed that because "no absolute meaning could be given to the words," failure to consider the trade usage by the Board below was in error. 173 Ct.Cl. at 395 & n. 13, 351 F.2d at 999 & n. 13. Lastly, this court in *Haehn* referred to industry custom to define contract terms requiring sealant to be formulated under a "continuous flow process." Trade usage was applied to give meaning to an undefined contract term, the meaning of which was not found in the contract, requiring specialized knowledge of industry practices. 15 Cl.Ct. at 59. In this case, however, the contract documents and the regulations speak clearly as to what the parties intended the term "supplies" to mean. *See Moore v. United States*, 196 U.S. 157, 166, 25 S.Ct. 202, 203, 49 L.Ed. 428 (1905); *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 579 (Fed.Cir.1987). Evidence of trade custom or practice cannot override unambiguous contract language. *Northwestern Indus. Piping, Inc. v. United States*, 199 Ct.Cl. 540, 550–51, 467 F.2d 1308, 1314 (1972); *S.S. Silberblatt, Inc. v. United States*, 193 Ct.Cl. 269, 288, 433 F.2d 1314, 1323 (1970); *WRB Corp. v. United States*, 183 Ct.Cl. 409, 436 (1968).

different meaning or a particularized definition is prescribed for use in that clause.)

### 1. Duty Free Entry clause

The Duty Free Entry clause prohibits government contractors from including within their bids amounts for import duties on supplies from qualifying countries. The restriction is placed upon "all supplies (including, without limitation, raw materials, components, and intermediate assemblies) produced or made in qualifying countries, which are to be incorporated in the end items to be delivered under this contract...." Defense Acquisition Regulation ("DAR") § 7–104.32 (1981). The clause, argues defendant, contemplates that components and intermediate assemblies are supplies, so the term is not limited to end items. Plaintiff rejoins that if "supplies" had the expansive meaning that defendant ascribes to it, a separate definition including raw materials, components, and intermediate assemblies would be superfluous.

### 2. The Buy American Act clause

In order to comply with the Buy American Act, 41 U.S.C. § 10a–10d (1982), NAVFAC inserted into plaintiff's contract provisions granting a preference for domestic end products over foreign end products. So as to describe the reach of the preference, both components and end items are defined:

> For the purpose of this clause—
> (i) "Components" means those articles, materials, and supplies which are directly incorporated into end products.
>
> ....
>
> (iii) "End products" means articles, materials and supplies, which are to be acquired for public use. As to a given contract, the end products are the items to be delivered to the Government, as specified in the contract....

DAR § 7–104.3(a). While acknowledging that the quoted definitions are limited to this clause, defendant makes the same argument: The term "supplies" contemplates the incorporation of parts and materials into end products and therefore cannot be limited to a description of end items. Plaintiff asserts that because the term is defined specifically within the context of the clause, the general meaning of supplies is inapplicable. Further, plaintiff argues that because the term is defined specifically within the clause, the usage does not support the reading put forward by defendant.

### 3. The Maintenance and Warranty Service of Equipment clause

The maintenance and warranty provisions of plaintiff's contract, § 35B.(2)(D), obligate plaintiff to provide maintenance and warranty service to the controls, and equipment other than the controls, for a period of one year. The contract details different notification procedures when defects are discovered in "controls" from when defects are discovered in "supplies other than controls." From this, defendant argues that the term "supplies" includes the component controls and cannot be limited to end items. Plaintiff replies that since it is clear from the contract that the term as used in the clause means both components and end items, it is clear from the context that the term is different from, and does not displace, the definition plaintiff urges for the Cargo Preference clause. Moreover, according to plaintiff, since the Maintenance and Warranty Service of Equipment clause is not a standard FAR clause, "its utility in elucidating the meaning of such standard clauses is doubtful." Plf's Br. filed Feb. 7, 1990, at 5.

### 4. Inspection of Supplies—Fixed Price clause

The inspection of supplies clause in plaintiff's contract requires plaintiff to provide for, and to maintain, a system of product inspection so as to insure that items delivered to the Government are in conformity with contract requirements. Under this clause the Government is given the right to inspect and test supplies.

> Definition. "Supplies," as used in this clause, includes but is not limited to raw materials, components, intermediate as-

semblies, end products, and lots of supplies. FAR § 52.246–2(a). Again, while acknowledging the definition is limited to this clause, defendant argues that the inspection clause is consistent with a broad reading of the term "supplies"—since under the inspection clause the Government is entitled to inspect all items incorporated into the end item. Plaintiff agrees that the inspection clause included in plaintiff's contract gives the Government broad powers to inspect items—including components. Its contention is that had the Government not specially defined the term "supplies" in the inspection clause, supplies would have the narrower definition plaintiff argues for and the Government would be entitled to inspect only end items.

5. The Warranty of Complex Products clause

Supplementing the Maintenance and Warranty Service clause, noted above, the Warranty of Supplies of a Complex Nature extends to government warranty protections for end items. In defining supplies the clause states:

> "Supplies," as used in this clause, means the end items furnished by the Contractor and related services under this contract. The word does not include "data."

FAR § 52.246–18. Defendant asserts that only in this clause, in contradistinction to those discussed above, does the term "supplies" mean end items. Defendant argues that "[i]f 'supplies' was intended to mean only the end product throughout the contract, this limitation would not be needed...." Def's Br. filed Jan. 25, 1990, at 5–6. Plaintiff disagrees, arguing that the term "supplies" signals end items generally; however, a special definition was required in the clause above so as to exclude data—which might also be an end item.

In choosing between differing interpretations of the term "supplies," the court is guided by the principle that an interpretation which gives a reasonable meaning to all parts of the contract is preferred over an interpretation that causes conflict among the clauses. *Fortec Constructors*

*v. United States,* 760 F.2d 1288, 1292 (Fed. Cir.1985); *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir. 1983); *Blinderman Constr. Co. v. United States,* 17 Cl.Ct. 860, 863 (1989). Defendant's expansive reading of the term "supplies" harmonizes the various clauses in plaintiff's contract. In all but the Warranty of Complex products clause, where supplies are defined as end items, the term encompasses many different types of articles. To follow plaintiff's reading of the term, the court would be required to narrow the construction of the term "supplies" to end items alone and construe the other clauses as presenting special exceptions to the rule. Such a reading is not preferred.

■■■ The conclusion that defendant's reading of the contract harmonizes many different provisions is supported by *Julius Goldman's Egg City v. United States,* 697 F.2d 1051 (Fed.Cir.), *cert. denied,* 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983). In that case, the question before the Federal Circuit was whether the Claims Court committed error in holding that plaintiff's contract with the Government obliged plaintiff to clean and disinfect its manufacturing and support facilities in addition to those premises containing poultry. As in the case at bar, the plaintiff in *Julius Goldman* urged a narrow construction of the contract terms and its contract responsibilities, while defendant offered a broader reading:

> The appellant primarily contends that its cleaning and disinfection of other buildings and facilities went beyond the contract phrase "poultry premises" of "Item No. 1" under "Services". Appellant contends the plain meaning of the contract terms required the cleaning and disinfection of only those premises containing poultry. The lower court, however, found numerous references in the contract requiring cleaning and disinfection of appellant's entire premises, "buildings" and "premises." Isolated instances of the phrase "poultry premises" cannot overcome the force of the repeated references indicating coverage of the entire premises. Contract interpreta-

tion has been consistently viewed as a harmonizing process in which the various parts of a disputed contract are to be construed as a whole to give meaning to all of its provisions....

697 F.2d at 1057 (footnotes omitted). Plaintiff's view of the term "supplies" would isolate it from the balance of the contract, and therefore is not preferred. A more literal and consistent construction of the term "supplies" has it signifying both components and end items.

### III. *Unresolved issues*

■ It is a well-settled principle of law that the intention of the parties in forming a contract governs its interpretation, *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971), and the words used in a contract have been held to be the best evidence in discerning the parties' intent. *See, e.g., Kronner v. United States*, 126 Ct.Cl. 156, 163, 110 F.Supp. 730, 734 (1953). The court has ruled that the term "supplies" was not ambiguous and that its plain meaning includes both end products and component parts. Plaintiff has not established that it interpreted the term as confined to component parts nor that it bid the contract on that basis, thereby creating an ambiguity. Without weighing defendant's contrary evidence, the court finds that plaintiff's evidence is inconclusive and contradictory; it does not satisfy the requirements of RUSCC 56(c) that the proponent of summary judgment establish its position as a matter of law. What plaintiff does demonstrate is that the DOD may have shared plaintiff's urged interpretation at the time of contract formation, insofar as the parties put forth genuine issues of material fact on this issue. *See Breese Burners, Inc. v. United States*, 128 Ct.Cl. 649, 659–60, 121 F.Supp. 530, 536 (1954) ("[W]hen we come to construe a contract we give to words their ordinary and commonly accepted meaning, unless it is shown that both parties understood that they were used in a different sense."). *Compare Blackburn v. United States*, 126 Ct.Cl. 874, 876–77, 116 F.Supp. 584, 586 (1953) (provision inserted into contract by supplier held not to be so

clear as to render inadmissible evidence on supplier's intention and mutuality of intention) *with Massachusetts Port Auth. v. United States*, 197 Ct.Cl. 721, 726, 456 F.2d 782, 784 (1972) (language of lease embodies the parties' intentions absent documentary or testimonial evidence which might affirmatively establish the parties' intentions at the time lease drafted). Moreover, even apart from the inconsistencies in plaintiff's own evidence, defendant registered disputed material issues of fact in response to plaintiff's asserted ambiguity. Because the cross-motions joined on a legal question as to which the material facts were uncontroverted—the plain meaning of the Cargo Preference requirements—the court has resolved the case on this basis. The following discussion analyzes the parties' showings concerning the alleged ambiguity.

### 1. Ambiguity

Plaintiff argues that the meaning of the Cargo Preference Act and implementing regulations is ambiguous and that the construction it relied upon in making its bid was reasonable. Plaintiff argues in brief that plaintiff, AmClyde, officials in the DOD, and the government contracting community in general each considered the term "supplies" to signify end products. To the extent that the term "supplies" can support another, more expansive definition, plaintiff asks that this court resolve ambiguities in the contract against NAVFAC.

A contract is ambiguous if it is susceptible to two different interpretations, each of which is found to be consistent with the contract's language. *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct.Cl. 358, 372, 393 F.2d 807, 815–816 (1968); *Monarch Painting Corp. v. United States*, 16 Cl.Ct. 280, 286 (1989). In addition, the contractor must establish that it relied upon its interpretation of the ambiguous terms in submitting its bid. *Lear Siegler Management Servs. Corp. v. United States*, 867 F.2d 600, 603–04 (Fed.Cir.1989) (citing cases). A contractor may establish reliance by proving "that its subcontractor relied on that interpretation and that there was no wide discrepancy in the other prices

obtained...." *Froeschle Sons, Inc. v. United States,* 891 F.2d 270, 272 (Fed.Cir. 1989).

Plaintiff relies on the declaration of John C. Hession, the former President of the Clyde Crane Division of AMCA International, in support of its argument. Mr. Hession's declaration details his belief that only if AmClyde were to ship parts sufficient to complete an entire crane would the preference for privately owned U.S.-flag carriers apply. Apparently, Mr. Hession believed that while a complete, but disassembled, crane could be characterized as a "supply", major subassemblies or components could not be so characterized. Moreover, based upon this understanding, plaintiff asserts that Mr. Hession supervised the solicitation of quotations from foreign-flag carriers. As Mr. Hession recounts:

> As I read the [Cargo Preference] clause in the bidding stage, it only required the transportation of "supplies" being furnished to the Navy on American flag vessels. The supplies to be furnished to the Navy under this contract were the 23 portal cranes. Accordingly, I read the clause as limiting the requirement to use U.S.-flag vessels only to the transportation of the cranes and not to transportation of the parts and pieces or components of the cranes which we would have manufactured overseas....
>
> ... The first step I took in making ... [the shipping] decision was to require Mr. Jensen, who was responsible for developing the shipping estimates, to obtain quotations from both foreign-flag and American-flag shipping companies. The initial quotations obtained by telephone and later confirmed in writing confirmed my belief that if we were required to use American-flag ships it would be considerably more expensive than if we could use foreign-flag ships....

Statement of John C. Hession, Dec. [illegible], 1989, ¶¶ **21, 22.** Similarly, Robert F. Erskine, an Assistant Vice-President of Craft Machine Works, states that had he known of the requirement to ship components aboard U.S.-flag carriers, plaintiff's bid would have accounted for the increased cost. Statement of Robert F. Erskine, Dec. 19, 1989, ¶ **19.**

Mr. Hession's declaration detailed AmClyde's approach throughout bid preparation. AmClyde executives identified items that were likely to affect shipping costs and accounted for these by adding either a known sum, costs for insurance, or a contingency in the bid. Among the cost factors identified by Mr. Hession were— would prices increase or decrease, and to what extent, over a six-year performance period; would shipment of complete cranes or component parts be more cost effective; could shipments be transported alongside cargo belonging to other companies or would it demand the services of an entire vessel; would the carrier be making a normally scheduled stop in Korea or would it require AmClyde to pay for a round-trip voyage; was the vessel equipped with machinery necessary to load and unload the cargo or would that equipment need to be provided alongside the ship; and, how much time would be needed to unload the cargo from the transporting vessel? Hession Statement ¶¶ **23–24.** As to the many uncertainties, Mr. Hession hoped "that our bid amount would cover our costs or that in the aggregate the underestimates would be offset by the overestimates." *Id.* at ¶ **25.** Had he thought that the Cargo Preference requirements applied to shipments of component parts, Mr. Hession declares, "I would have included a still further substantial contingency amount to cover the cost impacts on the overall project from the delay almost certain to result from being a captive of one or two U.S.-flag shipping companies." *Id.* at ¶ **30.**

Defendant asks the court to ignore Mr. Hession's statements in support of plaintiff's claims, characterizing them as "after-the-fact," Response to Plf's Proposed Finding of Fact No. 33, and inconsistent with contemporaneous documents in the record. Defendant notes that Mr. Hession's declaration does not cite or rely on contemporaneous bid documents that corroborate his understanding. To the contrary, defendant states that the documents produced during discovery evidence AmClyde's belief that

components manufactured by Hyundai must be transported to this country aboard U.S.-flag carriers. In communications with potential subcontractors, AmClyde referenced the requirement to ship aboard American registered vessels. A January 6, 1986 telex to Hyundai states: "Be aware the Navy requirement to use a U.S. Flag Vessel for the Shipment of components does penalize our freight situation." A November 7, 1986 letter to Meridian Shipping notes: "The cranes will be fabricated at Ulsan, Korea and then must be shipped in major modules via American flag vessel to Hampton, VA...." A March 6, 1987 solicitation letter to Lykes Bros. Steamship Company states: "Since these cranes are for the U.S. Navy, shipment must be made, 100%, on U.S. flag vessels."

Moreover, defendant points to a number of internal communications as evidence of AmClyde's understanding that the Cargo Preference requirements would apply to shipment of component parts. Minutes of AmClyde's Steering Committee Meeting of June 17, 1986, further illustrate the effort to scale back shipping costs: "As shipping dates are firmed up, reducing freight costs will be actively pursued.... Phil Haury will pursue relief from 100% U.S. flag shipment." On July 15, 1986 the Steering Committee met again. The record of this meeting notes: "U.S. Flag—doesn't look like will get relief."

Despite what appears to be an initial rebuke, AmClyde executives continued to explore an exemption from the requirement for shipment aboard U.S. vessels. In a September 18, 1986 memorandum, AmClyde's Gary R. Clark recounted a discussion between representatives of AmClyde, WTS Houston, Inc., and Universal Landsea Transport, Inc.:

> They could set up a meeting with another company that did $10,000 worth of investigation to get out of the US Flagship requirement. Note: This is a possibility but, more probably a waste of time because the chances of getting out of it on this contract is slim to none.

One week later, on September 25, 1986, Traffic Manager Chuck Jensen wrote to other AmClyde officials:

> [After receipt of "stylized drawings", he] met with Tom Korbett on Wednesday, 9/10/86 and discussed some concerns namely[:]
>
> 1. The commitment to the use of an American flag vessel. I asked Tom if we had gone to the Navy and told them of the substantial savings to be had by using a foreign flag vessel. He said yes, but that the Navy was committed to an American flag carrier and was prepared to pay extra.
>
> 2. Previously there was only one active American flag specialized carrier—Dock Express. As of the past 2 months, a second carrier American Heavy Lift has put one of their 2 heavy lift vessels back in operation. We also discussed the limited liner service available and that those vessels don't have the ability to handle large modules.
>
> ....
>
> I am putting a package together to send to American Heavy Lift this week, so that they can furnish a quote....

Finally, in an inter-office memo of January 6, 1987, (actually dated 1986 but written in 1987), AmClyde project manager Thomas E. Korbett detailed the high cost of shipping components aboard U.S.-flag vessels:

> \* This contract stipulates 100% US flag.
> \* Typical contract 50% US flag.
> \* Comments from various people in 1985:
> > "Navy stresses 100% US flag in bid stages."
> > "We know more expensive; subsidizing shipping industry."
> > "Would take President Reagan to waive."
> \* Contracting officer has authority initially to select 50% or 100% US flag.
> \* Contracting officer may have authority to revise contract from 100% to 50% US flag.
> \* Roger estimates 50% US flag would save $2,000,000 to $3,000,000.
> \* We must request contract revision.

* Suggest use Washington law firm handling escalation clause to handle for us.

These writings, defendant contends, prove that "AmClyde always believed it had to ship these components on American vessels, and, in fact, bid accordingly." Response to Plf's Proposed Findings of Fact No. 33 (citation omitted).

Defendant further argues that at the time plaintiff submitted its bid to the Navy, plaintiff's executives did not rely on the "legal position that the Cargo Preference Clause only applied to final end items and not to major crane components being shipped from Korea." Def's Br. filed Nov. 8, 1989, at 24. By letter of January 13, 1986, Mr. Erskine of Craft wrote to John McCaffrey, a Vice-president of AmClyde: "[I]f any items are supplied by you, as offered in your letters of January 8 and 13, they will comply with American Flag shipping requirements." Defendant also points to notes authored by Mr. Erskine regarding a September 29, 1986 meeting among representatives of plaintiff, the Navy, and AmClyde. Mr. Erskine wrote in his memorandum:

The major effort now is to establish a Houston marshalling yard and to contact the various U.S. flag carriers to obtain shipping to Hyundai and return from Korea to the port of Hampton Roads. The Navy was requested to review the U.S. flag clause to see if an error might have been made in selection. The basic U.S. flag carrier clause requires only 50% use of U.S. flags. The option which is included in this contract is a 100% use of U.S. flags. The reason for this request is to use U.S. flag carriers to transport to Korea and to be able to use a lower draft non U.S. flag ship to return the partially assembled cranes to the port of Hampton Roads....

Defendant argues that the Erskine writings corroborate its view that plaintiff was aware that the Cargo Preference requirements applied to shipments of major components from Korea.

Plaintiff rejoins that AmClyde bid based upon decisions made by Mr. Hession and that only his views are relevant. According to plaintiff, the views expressed in January 6, 1986 telex to Hyundai are "beside the point," Plf's Br. filed Feb. 7, 1990, at 20 n. 24, because the telex was not authored by Mr. Hession. Documents authored by Mr. Korbett, plaintiff continues, cannot speak as to AmClyde's assumptions in bidding the contract, since Mr. Korbett does not have personal knowledge of the events and discussions leading up to the bid. Mr. Korbett was not hired by AmClyde until after contract formation. According to plaintiff, only documents authored by Mr. Hession can reflect Mr. Hession's construction of the Cargo Preference requirements or the basis of AmClyde's bid.

Similarly, plaintiff dismisses documents created after AmClyde submitted its bid (and after Mr. Hession's departure from AmClyde in June of 1986), because they purportedly cannot evidence the assumptions on which AmClyde relied. Plaintiff contends in brief:

[W]hatever views were thereafter developed, at the time of bid Clyde believed that the clause permitted the shipment of the foreign-manufactured parts on foreign-flag vessels and relied upon that belief in making its bid.

Plf's Br. filed Feb. 7, 1990, at 22. Plaintiff does concede that AmClyde's contract administrator on the portal crane project, Phillip Haury, did express the opinion that major components being fabricated in Korea and being shipped to the United States would have to be transported aboard U.S.-flag vessels. Plaintiff argues that Mr. Haury's views should not be accorded weight because of Mr. Haury's tendency for self-promotion. The court was cited to the following colloquy in the deposition of Gary R. Clark of AmClyde:

Q  But [Phillip Haury] was an expert in government contracts, was he not?

A  If you asked Phil that, yes.

Deposition of Gary R. Clark, July 28, 1989, at 204. Furthermore, plaintiff asserts that Mr. Haury's opinion as to the reach of the Cargo Preference requirements is suspect because the basis for his opinion is not explained.

Neither does plaintiff find the documents authored by Mr. Erskine inconsistent with the view that only end products were required to be transported aboard U.S.-flag vessels. As to Mr. Erskine's notes of meetings between representatives of plaintiff, AmClyde and the Navy, plaintiff asserts that Mr. Erskine's role was simply that of a "note taker." Erskine Statement ¶ 30. Mr. Erskine states that he hoped to "avoid any liability to Craft," and the notes of the meeting "did not reflect his personal view or opinion." *Id.* Similarly, plaintiff argues that Mr. Erskine's January 13, 1986 letter to AmClyde regarding the Cargo Preference requirements, "merely relayed a routine request to confirm compliance with a check list of clauses." Plf's Br. filed Feb. 7, 1990, at 23. As Mr. Erskine details in his declaration:

I did not intend and do not consider my January 13, 1986 letter to Clyde to be inconsistent with this understanding. Whenever I was asked to confirm or explain something by the Navy, I relayed the identical requirements to Clyde. This was nothing but another one of those instances. The Navy had simply given me a number of things to confirm, and one of these was compliance with American Flag Shipping requirements. . . . In keeping with my policy of wanting to avoid any risk to Craft by injecting Craft unnecessarily between the Navy and the work Clyde was performing, I simply relayed this and all other requests to Clyde. . . . I simply asked them to comply with the clause, whatever the ultimate facts determined that to be, just as the Navy requested.

Erskine Statement ¶ 29. Plaintiff relies solely upon the averments of Messrs. Erskine and Hession, as stated in their declarations, in advancing its position, and the assertions in the Erskine and Hession declarations confront a formidable tide of other documentary evidence, all of which cannot be weighed on summary judgment. *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

2. Shared Interpretation

Plaintiff asserts that all parties to the contract and subcontract shared the view that the 1904 Act and Cargo Preference clause applied to end products and not to the component parts of those products. Moreover, plaintiff charges that the conduct and statements of DOD officials evidence a "mutual understanding" that the 1904 Act and the Cargo Preference clause were applicable only to end products. Plf's Br. filed Dec. 21, 1989, at 23.

According to plaintiff, the Navy's conduct before Congress, during the investigation of the Navy contract with the Bertolini Industries, Ltd., demonstrates that the Navy understood the Cargo Preference requirements to apply only to end items when it contracted with plaintiff. The events surrounding the Bertolini contract are included in plaintiff's case because the congressional dispute focused on the reach of the Cargo Preference requirements and Bertolini submitted the bid on its contract within three days of plaintiff's submission of its bid on the portal crane project.

During summer 1986 it was learned that the Navy had not included the Preference for Privately Owned U.S.–Flag Commercial Vessels clause in Bertolini's contract. Responding to an inquiry from Representative Helen D. Bentley, Rear Admiral J.P. Jones of NAVFAC wrote on August 28, 1986:

I have reviewed this matter and directed that the contract be modified to include the omitted clause which requires the contractor to use privately owned U.S.-flag commercial vessels, and no others, in ocean transportation of *any supplies to be furnished under this contract.* In that regard, *the supplies covered by this clause are only those listed in section B of the contract schedule* . . . .

(Emphasis added.) The significance of this letter to plaintiff is that the items listed in section B are end products to be furnished to NAVFAC and not component parts. Additionally, plaintiff cites the testimony of Frederick S. Sterns, previously identified as the Director of Installations and Facilities, Office of the Assistant Secretary of the Navy for Shipbuilding and Logistics, before the House subcommittee on the Mer-

chant Marine. Plaintiff asserts that Mr. Sterns' efforts to convince Congress that the Cargo Preference requirements applied only to end items reaffirms NAVFAC's construction of the clause when it contracted with plaintiff earlier that year. As plaintiff argues:

We sincerely doubt that in solemn proceedings before Congress Mr. Sterns would have characterized NAVFAC's view as "long-standing" if it had been developed in the last seven months. We are confident Mr. Sterns did not lie; it is obvious that NAVFAC's "long-standing" view was developed long before [contract award]....

Plf's Br. filed Feb. 7, 1990, at 10.

Plaintiff further relies upon a directive of October 21, 1986, authored by William C. Timperly, Director of NAVFAC's Contract Policy Division. Hoping to ensure that no other NAVFAC offices would omit the Preference for Privately Owned U.S.–Flag Vessels—Alternate I, from any future contracts, Mr. Timperly directed:

Effective immediately, all supply contracts will include, in full text, Alternate I of the subject clause. This clause requires that the items listed in schedule B be shipped on U.S. Flag vessels irrespective of whether the U.S. has accepted title to that supply. *Components that will later be assembled or manufactured into the final schedule B end item are not covered by this clause.*

(Emphasis added.) Contracting Officer Delores O'Malley apparently concurred with that view. In a March 11, 1988 letter requesting "review and advice" from NAVFAC Headquarters, Ms. O'Malley wrote:

[A]s pertains to the transportation issue, the contract includes the ... [Preference for Privately Owned U.S.–Flag Vessels— Alternate I]. Northern Division adopted ASN's position that this clause applied to the shipment of end items. However, ... [the Attorney General's opinion] provides legal determination that the Cargo Preference Act applies "to all supplies which are destined by contract for the use of the armed forces, regardless of

the time title is transferred." *At the time this contract was awarded, our understanding was that Act would apply only to end items....*

Defendant asserts that the DOD could not have shared plaintiff's view as to the reach of the Cargo Preference requirements, because at the time of award, neither the Navy nor the DOD held a consistent legal interpretation of the Act and clause. Defendant cites a letter dated September 16, 1986, to Rear Admiral Jones from MARAD Deputy Maritime Administrator Elaine L. Chou. In her letter Ms. Chou complains that NAVFAC's construction of the Cargo Preference requirements is both incorrect and inconsistent with the interpretation followed by other Navy commands:

NAVFAC's failure to ensure U.S.-flag carriage of the components under ... [the Bertolini] contract is also inconsistent with the Federal Acquisitions Regulation (FAR) provisions of FAR 52.247– 64 requiring flow down to all tiers of subcontracts. Additionally Naval Material Command's (NAVMAT) advice to this office of January 14, 1985 ... stated that compliance with the FAR clause will be ensured "where there is any possibility that commercial shipping will be used, either at the prime or any subcontract level." No distinction was made or inferred by NAVMAT that only "end items" shipped at these levels intended to be covered.

Defendant argues that at the time of contract award there was a "lack of any consistent Governmental interpretation" and that not until the summer of 1986 did NAVFAC have any reason to consider a "uniform and consistent policy interpretation of the Act and contract." Response to Plf's Proposed Finding of Fact No. 75 (citation omitted).

As to the March 11, 1988 letter of Contracting Officer O'Malley, defendant cites the court to her deposition testimony. Ms. O'Malley testified that while she believed, in March of 1988, that the Cargo Preference requirements applied only to end items, until that time she had not "dwelled

on the issue of supplies versus end items per se." Deposition of Delores O'Malley, July 11, 1989, at 50–51. Since the cognizant Navy officials had no view as to the reach of the Cargo Preference, defendant reasons that there could have been no view shared with or communicated to plaintiff.

It is interesting to note that, as to the documents thus far, both parties are taking the same tact. Each party asserts that documents authored after award evidence the earlier intent of its opponent, but fail to reveal anything significant about itself. Plaintiff would have this court find that statements of Navy officials in "solemn proceedings" Plf's Br. filed Feb. 7, 1990, at 10, before Congress show us NAVFAC's view of the contract at the time of formation. Plaintiff, however, would have the court discount statements or writings by AmClyde officials during the same period as irrelevant. Defendant, on the other hand, argues that AmClyde's post-award paper trail should lead to a finding that AmClyde consistently interpreted the Cargo Preference requirements as applicable to the shipment of component parts. Where Navy officials have signaled their agreement with the view that the Cargo Preference requirements apply only to end items, defendant argues that the statements point up only an inconsistent interpretation within the Government. One point is clear: Plaintiff has not established its own interpretation of the Cargo Preference requirements at the time of contract formation or its reliance on the urged interpretation in bidding the contract, as contemplated by RUSCC 56(c).

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is granted and plaintiff's cross-motion is denied. The Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

No costs.