**CRAFT MACHINE WORKS, INC.,**
Plaintiff–Appellant,

v.

**The UNITED STATES,**
Defendant–Appellee.

No. 90–5094.

United States Court of Appeals,
Federal Circuit.

Feb. 13, 1991.

Marcus B. Slater, Jr., Fort & Schlefer, of Washington, D.C., argued for plaintiff-appellant. With him on the brief were T.S.L. Perlman and William C. Buckhold. Also on the brief was Donald L. Moore, of Grafton, Va.

G. Scott Williams, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued for defendant-appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Robert M. Hollis. Also on the brief was Helen D. Rosen, Office of Gen. Counsel, Dept. of the Navy, Washington, D.C., of counsel.

Before PLAGER and RADER, Circuit Judges, and FRIEDMAN, Senior Circuit Judge.

RADER, Circuit Judge.

Craft Machine Works, Inc. (Craft) entered into Contract No. 62472–82–C–1455 with the Naval Facilities Engineering Command (NAVFAC) to supply shipbuilding portal cranes. The United States Claims Court read the contract's Cargo Preference Clause to require transportation of completed cranes and components on U.S.-flag vessels. *Craft Machine Works, Inc. v. United States*, 20 Cl.Ct. 355 (1990). This court reverses and remands.

## BACKGROUND

In February 1986, Craft entered into a contract with NAVFAC to design, assemble, deliver, and install 23 self-powered, 60–ton capacity, shipbuilding portal cranes. Craft subcontracted with AmClyde Engineered Products (AmClyde) for the design and delivery of several crane sub-assemblies. AmClyde subcontracted with Hyundai Heavy Industries Co., Ltd. in Seoul, Korea, to make some of the parts. These sub-assemblies included components which AmClyde had previously manufactured in the United States for this contract.

Part II of Craft's contract incorporates by reference Federal Acquisition Regulations (FAR) Clause 62, "Preference for Pri-

vately Owned U.S.–Flag Commercial Vessels":

(a) Except as provided in paragraph (b) below, the Contractor shall use privately owned U.S.-flag commercial vessels, and no others, in the ocean transportation of any *supplies to be furnished under this contract.*

48 C.F.R. § 52.247–64 (Alternate I) (1986) (emphasis added). The subcontract between Craft and AmClyde also incorporated this Cargo Preference Clause.

This regulation implements the Cargo Preference Act of 1904, 10 U.S.C. § 2631 (1988) (1904 Act). As amended in 1956, the 1904 Act states:

Only vessels of the United States or belonging to the United States may be used in the transportation by sea of *supplies bought for* the Army, Navy, Air Force, or Marine Corps....

*Id.* (emphasis added). The 1904 Act, by its terms, applies exclusively to the various entities of the Department of Defense (DOD). DOD administers the cargo preference regulatory scheme for military contracts. *See* 46 U.S.C.App. § 1241(b)(2) (Supp. V 1987); 46 C.F.R. § 381.3 (1989).

The Maritime Administration of the Department of Transportation (MARAD) checked compliance with the 1904 Act. MARAD required contractors to report the flag of registry for vessels shipping contract goods into the United States. 48 C.F.R. § 52.247–64(c)(1), (2).

When the first crane parts were ready for shipment from Korea, AmClyde sought freight quotations from United States and foreign vessels. Craft stated that the limited availability of suitable United States vessels made U.S.-flag service infrequent and irregular. AmClyde sought the foreign-flag price because it interpreted its contract's Cargo Preference Clause to cover only the shipment of complete cranes.

AmClyde's shipments did not include any completed cranes. AmClyde thus prepared its shipping quotation for Craft based on the price of a foreign-flag vessel.

At this time, a dispute arose among several Government entities about the meaning of the 1904 Act. *Craft*, 20 Cl.Ct. at 358. DOD did not consider the Act and its implementation by the contract's Cargo Preference Clause to require shipment of parts aboard U.S.-flag vessels. *Id.* MARAD, however, held a contrary view. DOD and MARAD agreed to submit the dispute to the Department of Justice (DOJ) for resolution. DOJ issued a memorandum deciding this issue on February 2, 1988.

In the midst of this dispute, in early October 1987, MARAD notified Craft and AmClyde of its view that the FAR clause required the exclusive use of U.S.-flag vessels. MARAD extended this cargo preference policy to parts as well as complete cranes. In an October 13, 1987 letter, AmClyde informed the contracting officer of its disagreement with this interpretation of the FAR provision. AmClyde stated that it would soon complete negotiations on a shipping contract with a foreign-flag vessel. Therefore, AmClyde asked NAVFAC to confirm its position before October 23, 1987.

In November 1987, Craft told the contracting officer of its intent to use foreign-flag vessels. On December 1, 1987, having received no response, AmClyde entered a contract with a foreign-flag vessel. The shipping contract contained penalties for cancellation.

On March 18, 1988, the contracting officer sent Craft a copy of the DOJ memorandum. The memorandum stated that the 1904 Act applies to all supplies for which the armed services have contracted, including those supplies to which it does not have title at the time of shipment.[1]

---

**1.** The Department of Justice (DOJ) memorandum stated:

[O]ur construction of the Act does not mean that cargo preference requirements would apply "to every shipment by every supplier or subcontractor at any tier of every nut, bolt or scrap of raw material that ultimately finds its

way into equipment purchased by the Military Departments." Under our reading of the Act, cargo preference requirements only apply to supplies "bought for" ("purchased for") the Military Departments that are clearly identified as destined for eventual military use at the time of shipment by sea.

On April 5, 1988, the Director of NAVFAC's Northern Division Procurement Contracts Office wrote to Craft, informing it that the DOJ's ruling required shipment of the crane parts on U.S.-flag vessels. Craft responded that its contract did not require U.S.-flag shipping and expressed an intention, absent explicit contrary directions, to ship on a foreign vessel. In a June 2, 1988 letter, NAVFAC specifically directed Craft to ship its cargo "by privately owned U.S.-flag commercial vessel."

AmClyde accordingly cancelled its foreign-flag shipping contract and filed a claim with Craft for an equitable adjustment of its subcontract. Craft submitted its parallel claim to the contracting officer. The contracting officer denied Craft's claim. Craft then sued in the Claims Court seeking the difference between foreign and U.S.-flag shipping costs. Craft and the United States both moved for summary judgment. The Claims Court granted the United States' motion, holding that the term "supplies" in the contract's Cargo Preference Clause required transportation of end items and component parts on U.S.-flag vessels. This court reverses and remands.

## DISCUSSION

■ This court must determine whether Craft's contract required U.S.-flag shipment of crane components as well as end items. The contract, by incorporating the FAR provision, requires the shipper to apply cargo preferences to "supplies to be furnished under this contract." Thus, this court must examine the meaning of "supplies to be furnished under this contract." Because contract interpretation is a matter of law, this court reviews the Claims Court's interpretation *de novo*. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984). In contract interpretation, the plain and unambiguous meaning of a written agreement con-

trols. *George Hyman Const. Co. v. United States*, 832 F.2d 574, 579 (Fed.Cir.1987).

■ The contract sets forth procedures for "offers ... for furnishing the supplies or services in the Schedule...." Under the heading "Supplies/Services," the contract's bid package schedule lists 24 items. Schedule item 0001 specifies "[e]leven self-powered, luffing boom, rotating, portal type cranes mounted on a traveling base complete, delivered, tested, and made ready for use at the Norfolk Naval Shipyard...." Four other items request delivery of complete cranes (0002, 0007, 0011, 0013). The remaining items cover maintenance, warranties, and data on the complete cranes or removal of existing cranes. Furthermore, General Paragraph 1.3 of the contract specifies that "[t]he cranes[s] shall be delivered fully assembled and ready for acceptance testing at the location specified...." Thus, the contract itself identifies the supplies a contractor must furnish. In sum, the "supplies to be furnished under this contract" are complete cranes.

The Claims Court erred in assessing the plain meaning of "supplies to be furnished under this contract." The Claims Court focused on the "unadorned" term "supplies" in isolation. *Craft*, 20 Cl.Ct. at 361. When thus stripped of its context, the Claims Court found that the word "supplies" included parts. The contract's Cargo Preference Clause, however, places the term "supplies" within the clarifying context of the phrase "supplies to be furnished under this contract." This language means that the contract provides the definition of "supplies." In a contract to furnish parts, parts would be the "supplies to be furnished." In Contract No. 62472–82–C–1455, however, NAVFAC contracted for complete cranes. Therefore, complete cranes were the "supplies to be furnished under this contract."

....

In sum, the language and structure of the Cargo Preference Act strongly support the conclusion that this statute applies to all supplies destined for delivery to the military. The status of the title of such supplies at

intermediate steps in the contracting process is of no relevance to the scope of the statute....

Memorandum of Assistant Attorney General Charles Cooper, Office of Legal Counsel, DOJ (Feb. 2, 1988) (citation omitted).

Complete cranes necessarily include booms, rotate platforms, portal bases, and other parts. Until assembled, "tested, and made ready for use" as a complete crane, however, delivery of these parts would not have satisfied Craft's contractual obligations. These parts, therefore, were not the "supplies to be furnished under this contract" to which the cargo preference provision refers. Rather, the contract required delivery of complete cranes.

■ This court also accords considerable weight to the prior long-standing interpretation, if reasonable, of the agency charged with administering a regulatory scheme. *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); *Beneficial Corp. v. United States,* 814 F.2d 1570, 1574 (Fed.Cir.1987). At the time of Craft's contract, DOD and NAVFAC interpreted the FAR Cargo Preference Clause to require only the shipment of end items on U.S.-flag vessels.

DOD was the agency charged with administering cargo preference policies on military contracts. The 1970 amendment to the Cargo Preference Act of 1954 provided:

Every department or agency having responsibility under this subsection [the 1954 Act] shall administer its programs with respect to this subsection under regulations issued by the Secretary of Transportation.

46 U.S.C.App. § 1241(b)(2) (Supp. V 1987). MARAD issued a regulation stating:

Each department or agency subject to the Cargo Preference Act of 1954, except the Department of Defense for which separate regulations will be issued, shall furnish ... the following information concerning each shipment of preference cargo....

46 C.F.R. § 381.3 (1989). MARAD's 1984 annual report confirmed: "The Department of Defense (DOD) administers the Military Transportation Act of 1904." 1984 DOT MARAD Ann.Rep. 25. Thus, DOD remained in charge of administering cargo preference regulations for military affairs.

The record contains substantial evidence of DOD's prior long-standing position on the scope of the cargo preference provision. For instance, in 1986, DOD officials testified at Congressional committee hearings about the Department's long-standing policy of interpreting the 1904 Act to cover only end items. In response to a question, the Director of Installations and Facilities, Office of the Assistant Secretary of the Navy, stated:

Counsel advised us that, based also upon Comptroller General's opinions going back 80 years to the inception of the act, coupled with their extensive and comprehensive review of the legislative history that in their opinion it was the intent of Congress that supplies in the 1[9]54 act was intended to apply to end items and end items only ... we feel compelled— counsel felt compelled—given the history of this language and its interpretation by the Department, that we were obliged to adhere to that interpretation.

*Government Agency Compliance with the Cargo Preference Laws: Hearings Before the Subcommittee on Merchant Marine of the House Committee on Merchant Marine and Fisheries,* 99th Cong., 2d Sess., 20 (1986).

On October 21, 1986, eight months after award of the Craft contract (and before AmClyde contracted with a foreign-flag vessel), NAVFAC's Commander issued a directive explaining FAR Clause 52.247–64:

This clause requires that the end items listed in Schedule B be shipped on U.S. Flag vessels irrespective of whether the U.S. has accepted title to that supply. Components that will later be assembled or manufactured into the final Schedule B end items are not covered by this clause.

Letter from William C. Timperley, NAVFAC Commander (Oct. 21, 1986). Moreover, NAVFAC's Northern Division Commanding Officer sent a March 11, 1988 Memorandum to the NAVFAC Commander about the Craft contract, stating:

At the time this contract was awarded, our understanding was that the Act would apply only to end items.

Professor John Cibinic, Jr.'s affidavit[2] underscores the reasonableness of DOD's long-standing policy:

> In a supply contract, such as the instant contract, the term "supplies" has been uniformly interpreted by contractors and Government officials to mean the end items to be delivered to the Government under the contract. Neither the Government nor its contractors have considered the raw materials, parts and components used to manufacture the "supplies" to be the equivalent of the term "supplies."

This court, in deferring to DOD's expertise in administration of cargo preference policies, determines that "supplies to be furnished under this contract" refers to end items, not parts. DOD later changed this policy and its regulation. Recognizing that prior FAR regulations did not cover components, DOD issued a new regulation which defines supplies as "end items ... and components of the foregoing." 54 Fed.Reg. 16111, 16121 (1989). Thus, DOD changed its position after receipt of DOJ's memorandum. The meaning of this contract, however, cannot change because the Government changed its interpretation of the law. *Cramp Shipbuilding Corp. v. United States*, 122 Ct.Cl. 72 (1952).

The Government urges this court to adopt the definition of "supplies" set forth in the general definition section of the FAR. FAR § 2.101. In doing so, the Government invites this court to replicate the Claims Court's error by concentrating on an isolated word rather than reading that word in its contractual context. Moreover, the Government and the Claims Court misconstrue the intent of the general definition section of the FAR. FAR § 2.101 sets out broadly the scope of what "supplies" can mean within the regulations, but does not presume to explain the term's meaning within any particular contract.

Moreover the general definition section contains explicit limitations. FAR § 2.101 provides that reliance on general definitions is inappropriate when "(a) the context in which [the terms] are used clearly requires a different meaning or (b) a different definition is prescribed for a particular part or portion of a part." FAR § 2.101 does not dictate a definition of "supplies" in the context of this contract. The syntactic context of the term "supplies" as well as the entire factual context for interpretation of the phrase "supplies to be furnished under this contract" clearly compel "a different meaning" than the general definition. The contract itself defined the "supplies to be furnished under this contract" as complete cranes. Furthermore, DOD's long-standing prior policy limited the clause to end items.

The Government also argues that several other clauses in the contract include specific definitions of the word "supplies." As stated above, FAR § 2.101 permits "a different definition ... for a particular part or portion of a part." The individual definitions of "supplies" in the Duty Free Entry Clause, the Buy American Clause, the Maintenance and Warranty Service Clause, the Inspection of Supplies/Fixed Price Clause, and the Warranty of Complex Products Clause do not apply to the phrase in the cargo preference provision. As the FAR acknowledges, different contractual provisions may use the same term in a different context to encompass a different meaning. The separate, individual usages of "supplies" in other provisions do not alter the meaning of the phrase including that word in the cargo preference provision. Rather these various usages underscore that the general definitions of

---

2. While acknowledging Professor Cibinic as a "renowned author and lecturer on government contract matters," the Claims Court refused to accept Professor Cibinic's affidavit as evidence of a trade usage of the term "supplies" in the contract. *Craft Machine Works, Inc. v. United States*, 20 Cl.Ct. 355, 362 n. 4 (1990). According to the Claims Court, the term's meaning "is not one which the contract itself fails to make clear." *Id.* This court agrees that evidence of trade practice does not trump unambiguous contract language. *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 581 (Fed.Cir.1987). *Northwestern Indus. Piping, Inc. v. United States*, 199 Ct.Cl. 540, 467 F.2d 1308, 1314 (1972). The Cibinic affidavit, however, also serves to explain the reasonableness of the Department of Defense's long-standing prior regulatory policy. For that purpose, it is probative.

FAR § 2.101 do not govern each specific clause of a contract, but only generally suggest the scope of the FAR itself. Nor does the fact that the five clauses individually define "supplies" require that this court necessarily find a single, overarching definition of the term to encompass all subordinate ones. Use of "supplies" in other clause-specific contexts does not control the meaning of "supplies to be furnished under this contract" in the Cargo Preference Clause.

## CONCLUSION

The language of the contract as well as the long-standing interpretation of the agency require reading the Cargo Preference Clause's phrase "supplies to be furnished under this contract" to require the U.S.-flag shipment only of complete cranes. Therefore, the judgment of the Claims Court is

REVERSED AND REMANDED.