**AMERICAN MARITIME OFFICERS SERVICE; Transportation Institute; District 2 Marine Engineers Beneficial Association Associated Maritime Officers, AFL–CIO; Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO, Plaintiffs–Appellants,**

**and**

**AT & T Communications, Inc., Plaintiff,**

**v.**

**STC SUBMARINE SYSTEMS, INCORPORATED; United States of America, Defendants–Appellees,**

**and**

**H. Lawrence Garrett, III; David A. Bottoroff; John T. Smith; Donald Rice; Richard Cheney, Secretary of Defense, Defendants.**

No. 90–1551.

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1991.

Decided Nov. 12, 1991.

As Amended Nov. 21, 1991.

Joel I. Klein, Onek, Klein & Farr, Washington, D.C., argued (Jonathan Blank, Ann R. Klee, Preston, Gates, Ellis & Rouvelas Meeds; Joseph Dinsmore Murphy; and Mark Fox Evens, Glen Franklin Koontz, Kris Anne Monteith, Keller & Heckman, on brief), for plaintiffs-appellants.

Maureen Clancy Lindsey, Naval Facilities Engineering Command, Dept. of Navy, Alexandria, Va. and William W. Goodrich, Jr., Arent, Fox, Kintner, Plotkin & Kahn, Vienna, Va., argued (Henry E. Hudson, U.S. Atty., Richard Parker, Dennis E. Szybala, Asst. U.S. Attys., Alexandria, Va.; and Gerald B. Greenwald and Dean L. Grayson, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., on brief), for defendants-appellees.

Before SPROUSE and NIEMEYER, Circuit Judges, and MURRAY, Senior United States District Judge for the District of Maryland, sitting by designation.

OPINION

NIEMEYER, Circuit Judge:

We must decide whether the Cargo Preference Act of 1904, 10 U.S.C. § 2631 (1988), which requires the use of United States-flag ships in the transportation by sea of supplies bought for the military, applies to the transportation of cable on a cable-laying vessel which will travel from its boarding port in Oregon to a location in the Pacific Ocean where the cable is to be laid pursuant to a Navy contract. The contract requires that the contractor design, fabricate and install an underwater cable between Sasebo, Japan, and Gesashi, Okinawa, and provide all materials necessary for the job. The Government Accounting Office (GAO) ruled that the Cargo Preference Act does not apply to the contract because it does not involve the transportation of supplies. The GAO determined that the contract, calling for the installation of cable, is primarily a service contract, of which the transportation of cable is only an incidental part. It distinguished this contract from one which requires the transportation of cargo from one port for the purpose of delivery to another. When the Navy, which is the procuring agency, adopted the interpretation made by the GAO, domestic maritime unions filed suit to object to the ruling because they feared members would lose jobs if foreign shipping were permitted. On cross-motions for summary judgment, the district court sustained the ruling of the GAO, finding that its interpretation was not arbitrary or capricious and not contrary to law. We affirm.

I

In March 1989, the United States Navy, through its Naval Facilities Engineering Command (NAVFAC), solicited competitive bids to design and install a submarine fiber-optic communication cable to run a distance of 500 miles along the floor of the Pacific Ocean from Sasebo, Japan, to Gesashi, Okinawa. The solicitation required that bidding contractors agree to engineer the installation, furnish all materials and spare parts f.o.b. at the installation site, and install the cable. The invitation also required that contractors use only United States-flag vessels to transport supplies to be furnished as part of the contract, a requirement that was intended to implement the Cargo Preference Act.

The Navy received formal proposals from AT & T Communications, Inc. and STC Submarine Systems, Inc. AT & T Communications proposed to use United States-flag vessels except for shore-related or shallow water work performed within Japanese territorial waters. STC Submarine submitted a proposal to use only foreign-flag vessels, in particular, a British-flag cable-laying vessel. While STC Submarine agreed to comply with the Cargo Preference Act, it took the position that the Act did not require the use of a United States-flag cable-laying vessel in performance of what essentially was a service contract.[1] STC Submarine's contract proposed that the cable would be manufactured in Portland, Oregon, loaded aboard a British cable-laying vessel, and then moved directly to the ocean locale of installation where the cable would be discharged into the sea and emplaced upon the ocean floor. It contended that these operations of an ocean-going cable-laying vessel did not constitute "transportation by sea of supplies" within the meaning of the Cargo Preference Act.

---

1. STC Submarine also initially suggested that the requirements of the Cargo Preference Act might be waived, based on the unavailability of United States-flag cable-laying vessels. *See Curran v. Laird*, 420 F.2d 122, 127–28 (D.C.Cir.1969) (en banc) (holding that the Act is subject to an implied exception when American ships are unavailable). Apparently, there are few existing cable-laying ships worldwide and the only United States-flag vessels of that type are owned by the Military Sealift Command and by AT & T Communications. Furthermore, when STC Submarine approached AT & T Communications, a competitor in the bidding, regarding the use of one of its vessels, AT & T Communications agreed to quote a rate that was applicable only through 1990 and only for a new cable-laying vessel "tentatively scheduled for delivery in November of 1990." While STC Submarine initially suggested that these circumstances may constitute "unavailability" within the framework of the *Curran* exception, it does not rely on this argument in this appeal.

Although the contracting officer of the Navy initially agreed that a United States-flag vessel would not be required, the Navy reversed its position following a "higher level review" which included the recommendations of the commander of the Military Sealift Command. The commander acknowledged that

> ocean transportation of supplies is normally thought to include port to port services ... [and acknowledged the argument] that the Act was intended to apply to those situations where there is some freight charge for transportation services.

Nevertheless, he concluded, "[t]his Command's policy[ ] is to utilize U.S. flag shipping to the extent it is available, including *nontransportation missions* such as cable laying." (emphasis added). The Navy's final position, therefore, recognized that the "Act could be interpreted to permit cable laying operations" by foreign vessels, but the Navy determined nevertheless "to utilize U.S. flag shipping to the extent it is available, including non-transportation missions such as cable laying," as a matter of policy.

STC Submarine filed a "bid protest" with the Comptroller General in the GAO, to which the Navy responded, defending its position that United States-flag vessels should be used for all at-sea movement of cable. The GAO sustained the protest of STC Submarine and concluded that the Cargo Preference Act does not apply to the transportation of cable on a cable-laying vessel when the cable is off-loaded into the sea as part of the installation process. The decision of the Comptroller General stated:

> Accordingly, we find that the restriction [in the Cargo Preference Act] does not apply to the movement of cable upon a specialized cable-laying vessel engaged in cable-laying services while travelling by sea from its loading port to the location in the sea where the cable is to be laid, since the cable at that time is a necessary, incidental aspect of the installation

services being provided and is not being transported for the purpose of delivery or shipment as cargo.

The Navy adopted the position of the GAO and solicited new proposals from AT & T Communications and STC Submarine in light of the decision. The naval contracting officer again reviewed the proposals, rating them both technically excellent. However, because STC Submarine's proposal quoted a lower price, the Navy awarded the contract to STC Submarine on July 5, 1990.

AT & T Communications filed suit in the district court to challenge the decision of the GAO but has since abandoned its effort. In a separate action, the appellants, American Maritime Officers Service; Transportation Institute; District 2 Marine Engineers Beneficial Association Associated Maritime Officers, AFL–CIO; and Seafarers International Union of North America, Atlantic, Gulf, Lakes, and Inland Waters District, AFL–CIO (the three labor unions and one labor-management association referred to collectively as "the maritime unions") challenged the GAO's decision. They contended that their members would suffer lost profits, wages, and associated benefits if foreign-flag vessels were permitted to transport the cable. On cross-motions for summary judgment, the district court sustained the decision of the GAO. Acknowledging that the issue was a close one, the court stated:

> [B]earing in mind the standard of review for this APA case, the Court could not say that the Navy, relying on the expert opinion of the GAO, acted arbitrarily or capriciously in reaching its result, or that its disposition of the matter was contrary to law.

This appeal followed.

## II

The Cargo Preference Act of 1904, as restated and reenacted in 1956,[2] 10 U.S.C. § 2631 (1988), provides in full:

> the transportation by sea of coal, provisions, fodder, or supplies of any description, purchased pursuant to law, for use of" the military.

---

**2.** As originally enacted, the operative language of the Cargo Preference Act provided that only United States-flag vessels "shall be employed in

Only vessels of the United States or belonging to the United States may be used in the transportation by sea of supplies bought for the Army, Navy, Air Force, or Marine Corps. However, if the President finds that the freight charged by those vessels is excessive or otherwise unreasonable, contracts for transportation may be made as otherwise provided by law. Charges made for the transportation of those supplies by those vessels may not be higher than the charges made for transporting like goods for private persons.

The Act's imposition of the requirement that only United States-flag vessels be used in the "transportation by sea of supplies" bought for the military protected and fostered United States shipping and enabled the creation of a strong domestic merchant marine. To avoid reexperiencing those conditions that existed during the SpanishAmerican War, when the United States encountered a shortage of American merchant ships, the Congress determined that by favoring United States-flag vessels over foreign, the government would be provided "for instant use a splendid fleet of vessels ready for any emergency." H.R.Rep. No. 1893, 58th Cong., 2d Sess. 6 (1904). At the same time, the merchant marine and commerce of the United States would be developed and increased. *See id.* at 5.[3]

The maritime unions contend that the Cargo Preference Act requires that STC Submarine use United States-flag vessels in transporting the cable from Portland, Oregon to the south Pacific, where it is to be laid. They argue that the plain meaning of the language "transportation of supplies bought for" the military admits of no other interpretation. They add that by applying the Cargo Preference Act to this contract, the Congressional purpose of favoring American shipping is served. Arguing that the *only* exception permitted by the Act arises when the "freight charged by the vessel is excessive or unreasonable," 10 U.S.C. § 2631, the unions contend that the exception urged by STC Submarine (for supplies not transported from port to port and incidental to a service contract) is precluded.

STC Submarine contends, in support of the interpretation made by the GAO and the district court, that "transportation of supplies" for the military does not include movement of cable in the performance of a cable-laying function. It argues that the contract is a *service* contract at sea which only incidentally requires the movement of materials necessary for the performance of the contract, and that, because this contract involves neither transportation by sea (i.e. from port to port) nor supplies, it is to be distinguished from the contracts intended to be restricted by the Cargo Preference Act.[4]

Act of April 28, 1904, ch. 1766, 33 Stat. 518 (1904). The 1956 recodification stated that the current language is intended to "restate, without substantive change" the original language. Act of August 10, 1956, ch. 1041, sec. 49(a), 70A Stat. 640 (1956).

3. The purpose more completely stated there is as follows:

It is never safe or wise to depend on foreigners for the defense of our own country. Our dependence must always be on our own men and ships to uphold the honor and dignity of our flag in the time of extremity.

This can not be unless such men and ships are at hand, ready and accustomed to service on the sea.

\* \* \* \* \* \*

To offset the disadvantage of our ships in competing with those of foreign nations the United States Government can afford at least

the assistance of employing its own vessels and its own citizens for its own freightage.

This would insure part cargoes at least to keep the ships moving across the ocean. The employment of American ships instead of foreign ships would greatly aid our vessels now out of employment, continue officers, engineers, and *seamen on the ocean instead of* employing an equal number of foreigners, and bring the construction and repairs to our own shipyards and mechanics, instead of developing the sea strength and industries of our national rivals and possible national enemies. *Id.* at 3, 5.

4. In support of its position, STC Submarine also argues that the maritime unions lack standing because they are not "interested parties" under the Competition in Contracting Act, 31 U.S.C. §§ 3551(2) and 3556, and that therefore they cannot protest a procurement decision. *As the* maritime unions point out, however, they are

We have found no court decision that interprets the applicable statutory provisions, and the legislative history yields only minor assistance in revealing the Congressional purpose, as we have described it above, and in providing a generalized statement of the circumstances to which the Act applies. Senator Hale, the floor manager of the 1904 bill, stated that the Act addresses "only the simple question that when the Government transports stores or goods *to foreign ports* it shall be done by vessels of the United States." 38 Cong. Rec. 2408 (1904) (emphasis added). Senator Perkins, a proponent of the bill, emphasized the Act's application:

> It is a broad, patriotic question that the ships should be built in the United States, manned and officered by American citizens, that are transporting the munitions of war and our sailors and the supplies of the Government *from one port of the United States to another or from any port of the United States to a foreign port.*

38 Cong.Rec. 2464 (1904) (emphasis added).

While the Navy had never interpreted the specific provision at issue before it conducted its review in connection with the current contract, Navy regulations do provide that a cable-laying ship is a service type ship and not a cargo vessel used "for transportation" (the term critical to an interpretation of the Cargo Preference Act). *See* Naval Acquisition Procedures Supplement 8.9000. Moreover, in the Navy's review of the current circumstances, the contracting officer concluded that the Cargo Preference Act did not apply to cable-laying services, and the commander of the Navy's Military Sealift Command agreed, concluding:

> [O]cean transportation of supplies is normally thought to include port to port services, i.e. loading the cargo aboard a

vessel transporting it across the sea concluding with the landing of the cargo.... Support for this conclusion can be found in the extensive legislative history surrounding the Act.

The commander further concluded that the term "transportation" should be given the same interpretation in the Cargo Preference Act as it receives in the Merchant Marine Act, 1920, 46 U.S.C.App. § 883 (1988), which requires the use of United States-flag vessels in the transportation of merchandise between ports of the United States. Notwithstanding the commander's analysis of the law that supported the contracting officer's decision, he reversed that decision, concluding that United States-flag vessels should be favored as a matter of policy.

As noted by the Navy's Military Sealift Command, the Jones Act's interpretation is relevant to the issue before us. That Act,[5] which became law in 1898, imposes restrictions analogous to those imposed by the Cargo Preference Act and was enacted for similar purposes. Indeed, the Jones Act served as a model in fashioning the restrictions imposed by the Cargo Preference Act. As Senator Bacon, a proponent of the Cargo Preference Act, stated during the debates, the Cargo Preference Act was essentially intended to extend the earlier enacted Jones Act to military cargo:

> The bill is really an enlargement of the present navigation laws.... Under the [Jones Act] no freight can be carried from any port of the United States to any other port under the jurisdiction of the United States, whether for the Army or for the Navy or for a private individual, unless it be in a vessel with an American registry; so that, so far as almost the entire volume of the trade is con-

---

not unsuccessful bidders who are protesting a contract award, and they take no position on the question of who should be awarded the contract. They argue simply that whoever is awarded the contract should use United States-flag vessels. The maritime unions correctly rely for standing on the general principles recognized in *Curran v. Laird,* 420 F.2d 122, 124–26 (D.C.Cir.1969) (en banc).

**5.** The Jones Act provides in relevant part: "No merchandise shall be transported by water ... between points in the United States ... in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States ..." 46 U.S.C. § 883 (1988).

cerned between the United States and any port under the jurisdiction of the United States, it is now controlled, or will be after the 1st of July, by existing law.

38 Cong.Rec. 2472 (1904).

Given the similarity between the Jones Act and the Cargo Preference Act, prior decisions that cable-laying vessels are not included within the provisions of the Jones Act are persuasive. The U.S. Customs Service, having had repeated occasion to construe the Jones Act on the issue of whether using a cable-laying vessel constitutes "the transportation of merchandise," has concluded consistently that a cable-laying vessel is not engaged in transporting merchandise between domestic places because the cable is not "landed." "It is the fact that the cable is not landed but merely paid out in the cable-laying operation, which makes the operation permissible." Customs Serv. Dec. 79–346 (January 30, 1979). *See also,* Custom Serv. Dec. 89–40 (December 2, 1988); Customs Rul. Ltr. 105648 (July 21, 1982).

Finally, we agree with the GAO and the district court insofar as each concluded that the movement by sea of equipment incidental to a service contract with the armed forces does not fall within the parameters of the Cargo Preference Act. In so concluding, we reason by analogy from the proposition accepted by the parties to this case: that not every component of every end item destined for overseas use by the military need be shipped to the manufacturer, if at all, by United States-flag vessels. *See Craft Machine Works, Inc. v. United States,* 926 F.2d 1110, 1114–15 (Fed.Cir.1991) (explaining that " 'sup-

plies to be furnished under the contract' refers to end items, not parts" as far as contract provisions and regulations implementing the Cargo Preference Act are concerned). If one accepts, as the court did in *Craft,* that a proper interpretation of the term "supplies" must focus upon the object of the military contract, rather than its component parts, then it follows that a *service* contract with the military does not involve the "transportation of supplies," even though the provision of material necessary for contract performance might be included as an incident of that performance.

Taking into consideration the language and context of the Cargo Preference Act, the legislative history, the procuring agency's legal interpretation, and the analogous interpretations of the Jones Act by the U.S. Customs Service, we conclude that the interpretation applied by the GAO and the district court is the correct one.[6]

We hold, therefore, that when a government contractor transports cable on a cable-laying vessel to a location in the ocean, where it will lay the cable pursuant to a contract to install the cable for the military, it is not "transporting supplies for the military" as that term is used in the Cargo Preference Act. Accordingly we affirm the judgment of the district court.

AFFIRMED.

---

**6.** We do give some limited deference to the interpretations of the Cargo Preference Act by the Navy and the GAO when participating in procurement activity. *See M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1298–99 (D.C.Cir.1971) (criticizing district court for inadequate deference to Air Force's procurement officers and for disregarding Comptroller General's review); *see also Shoals American Indus. v. United States,* 877 F.2d 883 (11th Cir.1989). Moreover, greater deference is due the interpretations of the Jones Act by the U.S. Customs Service, which is regularly called upon to interpret and apply it. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).