ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Superior Maritime Services, Inc. | ) ASBCA No. 63407 |
| | ) |
| Under Contract No. HTC711-19-D-W034 | ) |

APPEARANCE FOR THE APPELLANT:     Mr. Dan Wittenberg
                                   Vice President


APPEARANCES FOR THE GOVERNMENT:     Caryl A. Potter, III, Esq.
                                     Air Force Deputy Chief Trial Attorney
                                    Nicholas T. Iliff, Jr., Esq.
                                     Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE ARNETT

This appeal arises from a commercial services contract awarded by the U.S. Air Force (the government or Air Force) to appellant Superior Maritime Services, Inc. (Superior) under which Superior shipped cargo from Houston, TX to Diego Garcia and incurred additional costs at the port due to delayed receipt of cargo. The government contends that Superior mistakenly relied upon unauthorized instructions from the government shipper and made a business decision to wait for the delayed cargo.

The Board has jurisdiction over this appeal pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. The parties elected to submit this appeal on the record pursuant to Rule 11 and requested that the Board decide entitlement only.

Because the government delayed arrival of the fuel pod cargo at the port of Houston causing Superior to incur additional costs, the appeal is sustained, in part. The container stuffing portion of Superior's claim was withdrawn and is dismissed.

FINDINGS OF FACT

*The Contract:*

1.  On July 9, 2019, the government awarded an indefinite quantity commercial services contract for ocean and intermodal[1] distribution services to Superior. The contract included a base year and four option years. (R4, tab 1 at 1, 3-6)

2.  On June 10, 2021, the government issued a Request for Quote for a One-Time-Only (OTO) booking for movement of 64 pieces of breakbulk (i.e. non-containerized cargo) and containerized cargo door-to-port from Houston, TX to Diego Garcia, an island in the British Indian Ocean Territory (R4, tabs 3, 14 at 4, 1 at 104, 228). On June 17, 2021, the government awarded OTO booking GUSIO2 to Superior (R4, tab 14). The booking indicated the cargo would be available June 16, 2021, with a Required Delivery Date (RDD) of September 4, 2021[2] (R4, tab 14; gov't br. at 2).

3.  The cargo included numerous pieces of crane equipment, a tractor, and four massive fuel pods. Superior was to pick up all cargo in Houston except for the fuel pods which it had to transport by truck from Rancho Cordova, CA to the port of Houston. (App. supp. R4, tabs 2-3)

4.  The booking stated, "The actual cargo booking dictates the cargo movement" (R4, tab 14 at 2). Emphasized in bold red lettering, Special Instruction No. 5 stated, "All pieces must travel together to maintain unit integrity." Special Instruction Nos. 6-7 noted that the cargo included hazardous material. (R4, tab 14 at 4) The stated performance requirement was that "all cargo booked under this contract shall successfully move in accordance with the terms of the contract" (R4, tab 1 at 35).

5.  Mr. Bryan Slutman of the U.S. Naval Research Laboratory was identified as the Shipper Point of Contact (POC) and Consignee POC for the fuel cargo (app. supp. R4, tab 8 at 3-4). He was neither the contracting officer nor his or her representative (COR) (gov't br. at 9).

---

[1] For intermodal service (i.e., transportation by more than one mode of transportation), the contractor maintains responsibility and liability for the entire movement until delivered to the final destination (R4, tab 1 at 231).

[2] While the booking reflects a RDD of August 9, 2021 (R4, tab 14 at 2), the parties consistently treat the RDD as September 4, 2021 (R4, tab 82 at 1; gov't br. at 2).

*Vessel loading, cargo delay, and shifting:*

6. On July 15, 2021, Superior's chartered vessel arrived in the port of Houston and began loading cargo on the morning of July 16, 2021 (R4, tab 8 at 3). Late afternoon on Friday July 16, 2021, Superior notified the vessel operator that the fuel pod cargo "will probably not be in the port until July 18 PM/July 19 AM. Please order your labor accordingly." (R4, tab 37 at 6)

7. The empty fuel pods were to be transported via truck approximately 2,000 miles from California to Houston, Texas and filled with fuel at the port before being loaded onto the vessel (gov't br. at 3). However, the government shipper filled the pods with fuel in California. Because the pods were marked "Transport Empty Only" and not suitable to be transported full, they could not be transported via truck while filled with fuel (gov't br. at 3). According to Superior's Operations Manager, "It took days for the shippers to empty the tanks and put the fuel into smaller DOT approved totes." (R4, tab 90 at 7) Once the shipper repackaged the fuel in suitable containers, the empty pods and fuel were transported by truck to the port of Houston (app. br. at 2-3).

8. The government admits, and we find, that the government shipper delayed the cargo's arrival at the load port (answer ¶ 35; gov't br. at 3; R4, tab 82 at 9).

9. By 4:00 pm on Saturday July 17, 2021, all cargo had been loaded on the vessel except for the fuel pods, and terminal operations requested that the vessel shift "to allow a working vessel to come alongside K dock" (R4, tabs 90 at 4, 8 at 1-2). At 8:24 pm that evening, Shipper POC Mr. Slutman texted Superior, "Call me please." With no immediate response, he sent a second text at 8:26 pm stating, "**I need to make sure the captain understands he can't leave until the last delivery arrives.** Everything else is loaded." (R4, tab 17 at 3) (emphasis added)

10. On Monday July 19, 2021 Mr. Slutman and a second shipper representative inspected the cargo aboard the vessel (R4, tab 37 at 4). In conjunction with the inspection, Superior emailed Mr. Slutman,

> Please note the delivery address of the new terminal (as the vessel must shift once again due to the late arrival of the final fuel pods). Per telcon (sic) we still await your promised written orders to hold the vessel in Houston until these 4 x fuel pods are loaded aboard. As you know the vessel has been awaiting their arrival since PM July 17 now and has already shifted once while awaiting the arrival

3

of the fueld (sic) pods.  **Please send those "not to sail" instructions to us by return email today.**

(R4, tab 37 at 1) (emphasis added)  We find that Superior exercised due diligence to mitigate the delay.

11.  Following the inspection, Mr. Slutman responded,

> As we discussed the fuel pods being transported by your logistics carrier have not arrived at the port.  We haven't received adequate information on the movement of these to estimate an arrival.  Please check with the carrier for a status.  These tanks are part of the booking CGA Shipping received from SDDC.  They are an essential part [of] the LR1750 Crane being moved. Please ensure that all components of the booking are loaded on the vessel.

(R4, tab 37 at 1)

12.  On July 20, 2021, Superior notified the COR of the delayed cargo stating that the fuel pods had just arrived and would be loaded that evening (R4, tab 88 at 3-4).  The vessel left the port of Houston that evening and sailed more than 11,500 nautical miles over approximately 45 days to deliver all cargo to Diego Garcia by September 3, 2021—one day prior to the RDD (R4, tab 8 at 1; gov't br. at 4).

*Contract Provisions:*

13.  Under the contract, Superior's performance objective was to "deliver all cargo" by the RDD.  The contract stated, "If the Contractor experiences delays during movement, the Contractor may submit a delay request, with proper documentation . . . . For delays not caused by the Contractor, the Contractor must still exercise due diligence to deliver cargo as soon as consignee is able to accept delivery."  (R4, tab 1 at 35)

14.  Under the contract, contractor costs arising from government-caused delay or relating to an alleged change may be submitted as requests for equitable adjustment in accordance with Federal Acquisition Regulation (FAR) 52.212-4(c) and (d) (R4, tab 1 at 30, 35).  Section 6.2 addresses compensation/financial liability for government delay stating:

> **Specifically, to the extent action or inaction by the U.S. Government in either its contractual or sovereign capacity, causes a delay in Contractor performance, the**

4

**Contractor shall be entitled to an equitable adjustment for costs incurred directly** related to the safety and security of U.S. Government cargo or **related to efforts to deliver the cargo as contracted**. Such cost shall be reasonable, supported by appropriate documentation and subject to audit The Contractor shall be entitled to such equitable adjustment under this contract to the extent that:

a) The U.S. Government action or inaction is otherwise not compensable under other provisions of this contract; and

b) The U.S. Government action or inaction interferes with or prevents performance of a contractual obligation by a reasonable Contractor; and

c) The Contractor's actions or inactions have not contributed to the Government caused delay; and

d) The Contractor has exercised due diligence to mitigate the delay or the financial consequences of such delay.

(R4, tab 1 at 29)

15. Under Section 9.Q, Vessel Demurrage, the contract provides that the contractor shall be compensated for "berthing delays caused by the Government (see Exhibit 3, PWS, paragraph 7.B.2.3) based on demurrage rates (per vessel day) in the Rate Guide. Charges are prorated for the actual period of delay" (R4, tab 1 at 66).

16. Section 7.B.2.3 provides examples of circumstances in which the contractor's vessel is shifted and entitled to demurrage: "If the Government directs the Contractor to an encumbered berth, or Government-provided stevedores are not available upon the vessel's scheduled arrival, resulting in a vessel delay, demurrage is payable on a pro rata basis at the demurrage rate established in CARE until the berth or stevedores are available" (R4, tab 1 at 45).

17. Section 9.D of the Contract addresses "Canceled Shipments/No Shows" (R4, tab 1 at 59-60). Because the record indicates that the shipment was not canceled and the late/delayed delivery of the fuel pods did not equate to a "no show," we find that Section 9.D, in its entirety, does not apply.

18. Specifically, Subpart 9.D.1 states that the contractor shall accept cancellation of shipments for booked cargo without penalty to the Government and requires the government to provide cancellation notice of at least 48 hours for door to

5

port bookings (R4, tab 1 at 59). We find no evidence that shipment of the fuel pods was cancelled or to be rebooked, nor did Superior receive timely notice of such from the government.

19. Subpart 9.D.2 requires the contractor to notify the Ordering Officer of "cargo not tendered to the Contractor in time to meet the booked sailing that has not been cancelled or rebooked" (*id.*). We note that Superior notified the COR of the government delay on July 20, 2021—prior to the vessel's departure from the port of Houston (R4, tab 88 at 3-4). We also note that the Ordering Officer lacked authority to make changes to the terms and conditions of the contract (R4, tab 1 at 232).

20. Subpart 9.D.3 states, "For cargo that misses the booked sailing through no fault of the Contractor, the Contractor shall load cargo on the next scheduled sailing after receipt of cargo. The Contractor shall notify the Ordering Officer (using BRT) at time of occurrence" (R4, tab 1 at 59). Section 9.D including this subpart are not applicable to the circumstances presented by this OTO booking with no subsequent sailings contemplated.

21. Subpart 9.D.4 states, "When the Government notifies the Contractor of cargo not available for a booked sailing, the Contractor shall then designate a new vessel based on the revised availability of cargo" (R4, tab 1 at 60). There is no evidence of government notice to Superior that the fuel cargo was unavailable for the booked sailing or of a subsequent sailing upon which the delayed cargo could have been booked. Section 9.D including this subpart is not applicable to the case at bar.

22. Subpart 9.D.5 precludes a contractor from holding the government liable for vessel demurrage if the shipper fails to release a container in time to meet a specified sailing date (*id.*). We find subpart 9.D.5 is inconsistent with the circumstances of government delay in this case, Section 6.2 which authorizes compensation for such delay, and the nature and instructions of the OTO booking.

*The Claim*:

23. On June 7, 2022, Superior submitted a Request for Contracting Officer Final Decision (claim) (R4, tab 80 at 1-2). Superior requested $116,058.76 in additional costs including $43,119.13 for detention[3] of vessel, $54,457.29 for two additional berth shiftings[4], and $18,482.34 for cargo stuffing in Houston, TX (R4, tab 83 at 1).

---

[3] Although Superior uses the term "detention," Superior seeks demurrage at a rate of $12,800/day for 3.08333 days (R4, tab 71 at 2).
[4] The shifting claim includes costs for pilots, towage, mooring, dockage, and stevedoring expenses (R4, tab 75 at 2).

24. In a final decision dated August 30, 2022, the contracting officer denied Superior's claim (R4, tab 82). On September 16, 2022, Superior filed an appeal with the Board seeking $116,058.76 plus interest under the CDA. The appeal was docketed as ASBCA No. 63407. Superior subsequently withdrew its cargo stuffing claim reducing the total amount sought to $97,576.42 (app. br. at 1).

DECISION

## I. The Parties' Contentions

Superior contends that it incurred additional costs of $43,119.13 for vessel detention and $54,457.29 for two additional berth shiftings arising from the government's delay of the fuel pod cargo while Superior's vessel was loading at the port of Houston (app. br. at 3-4).[5] There is no dispute that the government shipper delayed arrival of the fuel pod cargo at the port (finding 8).

The government asserts that all expenses Superior allegedly incurred were due to its failure to comply with Section 9.D of the contract and Superior's business decision to follow instructions from an unauthorized person (gov't br. at 1). Specifically, the government contends that Superior violated the terms of the contract by failing to notify the Ordering Officer of the delayed fuel cargo and is precluded from recovery for demurrage under subpart 9.D.5 (*id.* at 7-8).

## II. Standard of Review under Board Rule 11

Board Rule 11, the parties may waive a hearing and instead have the Board issue a decision based on the record. "Unlike a motion for summary judgment, which must be adjudicated on the basis of a set of undisputed facts, pursuant to Board Rule 11, the Board 'may make findings of fact on disputed facts.'" *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031 (citation omitted).

## III. The government delayed Superior's performance.

We now address the detention and shifting portions of Superior's claim which relate to the delayed fuel pod cargo. It is undisputed that the government shipper delayed arrival of the fuel cargo at the load port in Houston (finding 8). Section 6.2 of the contract provides remedy to a contractor that is delayed by the government stating that the contractor "shall be entitled to an equitable adjustment for costs incurred directly . . . related to efforts to deliver the cargo as contracted" (finding 14). Entitlement to an equitable adjustment for delay is contingent upon meeting four

---

[5] Superior has withdrawn its claim of $18,482.34 for cargo stuffing (app. br. at 1).

conditions: 1) government action or inaction is otherwise not compensable under other provisions of this contract; 2) government action or inaction interferes with or prevents performance of a contractual obligation by a reasonable contractor; 3) the contractor's actions or inactions have not contributed to the government caused delay; and 4) the contractor has exercised due diligence to mitigate the delay or the financial consequences of such delay (*id.*).

Here, Superior was delayed because the government impeded transport of the fuel pods by filling them with fuel in California when they were to be transported empty to the port. This action delayed Superior's transport of the fuel pods and, ultimately, the vessel's departure from the port of Houston. First, the government's action is not compensable under another provision of the contract. Second, the government's action interfered with Superior's performance, namely its ability to transport the fuel pods in time to make the loading window at the port of Houston (finding 8). Third, Superior's actions did not contribute to the government caused delay. Finally, Superior exercised due diligence to mitigate the delay and financial consequences of such delay (finding 10).[6] Specifically, Superior notified the vessel operator of the delayed cargo and gave instructions to "order your labor accordingly" (finding 6). We found that Superior held the vessel to avoid breaching the terms of the OTO booking that "All pieces must travel together to maintain unit integrity" (finding 4). Accordingly, we hold that Superior has met the requirements for an equitable adjustment to the contract as a result of the government caused delay.

The contract uses mandatory language that the contractor "shall" be entitled to an equitable adjustment for costs incurred directly related to efforts to deliver the cargo as contracted. As such, relief to the contractor for government delay is not optional. Thus, we hold that Superior is entitled to compensation under Section 6.2 for costs directly related to its efforts to deliver the cargo as contracted.

## IV. Harmonious contract interpretation does not favor the government's application of Section 9.D.

Citing Section 9.D of the contract, the government contends that Superior is precluded from recovery for government delay. We disagree. We construe the

---

[6] There is no data provided by the parties regarding what costs the government would have incurred to place the delayed fuel pods on a subsequent OTO booking to Diego Garcia if Superior had sailed without them. Presumably, re-booking another OTO would have been much more costly than the delay to this booking.

contract and OTO booking to give meaning to all parts consistent with the well-established rules of contract interpretation:

> "Contract interpretation begins with the language of the written agreement." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "'In contract interpretation, the plain and unambiguous meaning of a written agreement controls.'" *Hercules Inc. v. United States*, 292 F.3d 1378, 1380–81 (Fed. Cir. 2002) (quoting *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1113 (Fed. Cir. 1991)). We must interpret a contract "'in a manner that gives meaning to all of its provisions and makes sense,'" *Langkamp v. United States*, 943 F.3d 1346, 1353 (Fed. Cir. 2019) (quoting *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)), and we seek to "'avoid[ ] conflict or surplusage of [the contract's] provisions,'" *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997) (quoting *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992)). *See also NVT Techs.*, 370 F.3d at 1159 (explaining that interpretations should "harmonize and give reasonable meaning" to all parts of the contract, rather than "leave[ ] a portion of the contract useless, inexplicable, void, or superfluous"). Contract provisions should not "be construed as being in conflict with [one] another unless no other reasonable interpretation is possible." *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979 (Ct. Cl. 1965).

*NOAA Maryland, LLC v. Adm'r, of Gen. Servs. Admin.*, 997 F.3d 1159, 1165-66 (Fed. Cir. 2021).

As previously discussed, the contract includes Section 6.2 which requires an equitable adjustment for costs directly arising from government delay. The contract also includes Section 9.D which addresses "Canceled Shipments/No Shows" (finding 17). Because this case does not involve a canceled shipment or a "no show" we hold that Section 9.D of the contract does not apply in this instance. Review of the subparts of 9.D further reinforces its inapplicability to the case at bar. Since this was an OTO booking with no next chartered sailing, rebooking the cargo on a subsequent sailing was not feasible and was contrary to the express booking instruction requiring that "All pieces must travel together to maintain unit integrity" (finding 4). While the government faults Superior for failing to notify the Ordering Officer over the weekend regarding the delayed cargo, we note that the Ordering Officer lacked authority to approve a change to the contract. Thus, the Ordering Officer could not have directed Superior to sail without the fuel pod cargo in breach of the terms of its booking or held the vessel thereby incurring additional costs. We also note that Superior notified the COR before the vessel left the port of Houston (finding 12). The boilerplate language of Section 9.D does not contemplate the circumstances of government delay encountered in this case under this OTO booking. Finally, the government's

9

application of Section 9.D renders Section 6.2 superfluous and contravenes the express language of Special Instruction No. 5. Thus, the government's arguments are unpersuasive.

A harmonious interpretation of the contract affords Superior a remedy for government delay under Section 6.2.

## V. Superior's damages arise from the government-caused delay, not its mistaken reliance on unauthorized direction from the government shipper.

The government contends that the expenses incurred by Superior were the result of its business decision to follow instructions from an unauthorized person (gov't br. at 1, 8-9). We disagree.

The government correctly notes that Mr. Slutman did not have authority to direct Superior or change the contract. The shipper was not a party to the contract between the government and Superior and, therefore, had no authority to hold the vessel. *See Guardian Safety*, 19-1 BCA ¶ 37,333 at 181,561 (citing *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947) (holding contractor assumes risk of ascertaining authority of agents who purport to act for the government). To the extent that Superior relied upon unauthorized direction from Mr. Slutman, it erred in doing so. However, such reliance is not fatal to Superior's case for entitlement.

We conclude that Superior incurred additional costs as a direct result of the government-caused delay. As the claimant, Superior bears the burden to prove liability, causation, and resultant injury. *See Sphinx Int'l Inc.*, ASBCA No. 38784, 90-3 BCA ¶ 22,952 at 115,222; *see also Northrop Grumman Corp.*, ASBCA No. 52785, 03-2 BCA ¶ 32,280 at 159,710 (citing *Elec. and Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1355 (Ct. Cl. 1969)). The record reflects that government delay to the fuel pod cargo caused Superior to incur additional costs for demurrage and shifting at the port of Houston. Accordingly, Superior has met its burden.

The delayed fuel pod cargo placed Superior in a precarious situation, caught between sailing without the fuel pods in breach of the terms of the booking or holding the vessel to wait for the fuel pods resulting in demurrage and shifting expenses. Superior should not be penalized for satisfying its performance objective and honoring the special instructions of its OTO booking. While Superior should have sought direction from the contracting officer on the weekend, its failure to do so did not cause the government delay or the resulting costs. Moreover, Superior's reliance, if any, on unauthorized direction from the shipper also did not cause the delay or resulting costs. This circumstance was caused by government delay to the fuel pod cargo, and the government is responsible for the costs arising directly from such delay pursuant to Section 6.2.

10

CONCLUSION

For the reasons stated herein, the appeal is sustained in part regarding Superior's vessel detention and berth shifting claim. The withdrawn container stuffing portion of its claim is dismissed. Accordingly, the matter is returned to the parties for resolution of quantum.

Dated: August 17, 2023

LAURA J. ARNETT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63407, Appeal of Superior Maritime Services, Inc., rendered in conformance with the Board's Charter.

Dated: August 17, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals